[No. B172775. Second Dist., Div. Four. May 20, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO RINCON, JR., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.–VIII.

## COUNSEL

Michael D. Grahn and Timothy C. Lannen for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Deborah J. Chuang and Stephanie C. Brenan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## WILLHITE, J.—

### INTRODUCTION

Defendant Mario Rincon, Jr., appeals from the judgment of conviction following a jury trial. Defendant and his codefendant, Ludwig Oswaldo Juarez, were jointly charged with the murder of John Rutherford (Pen. Code, § 187, subd. (a), count 1),[1] the attempted willful, deliberate, and premeditated murder of Frank Salas (§§ 664, 187, subd. (a), count 2), shooting at an inhabited dwelling (§ 246, count 3), and conspiracy to commit murder (§ 182, subd. (a)(1), count 4). The murder and attempted murder counts also alleged that a principal discharged a firearm (§ 12022.53, subds. (c) and (e)(1)), and that a principal personally used a firearm (§ 12022.53, subds. (b) and (e)(1)). All four counts alleged that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Defendant and codefendant Juarez were tried concurrently by separate juries. Defendant's jury convicted

---

[1] Undesignated section references are to the Penal Code.

defendant on all counts, finding the murder to be of the second degree, and finding not true the allegation that the attempted murder was willful, deliberate, and premeditated. The jury found the firearm discharge and use allegations true, but found the gang enhancement allegation not true. The trial court sentenced defendant to a term of 62 years to life.[2]

In the published portion of our opinion, we hold that certain out-of-court statements made by Frank Salas to prosecution witness Nestor Sanchez were admissible as spontaneous statements under Evidence Code section 1240. Further, we find that the statements were not "testimonial" within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]. In the unpublished portion, we reject defendant's remaining challenges to his convictions. However, we strike the sentence enhancements for discharge of a firearm (§ 12022.53, subd. (c)) and use of a firearm (*id.,* subd. (b)) imposed on counts 1 and 2, and remand for resentencing. In all other respects the judgment is affirmed.

## EVIDENCE

Shortly before midnight on December 7, 2002, John Rutherford, a member of the Varrio Puente gang who was known as "Blanco," was shot and killed at 16310 Bamboo Street in La Puente. Defendant was also a member of Varrio Puente, nicknamed "Sleepy," as was codefendant Juarez, known as "Bandit." Frank Salas, the alleged victim of the attempted murder charge, was a former member of Varrio Puente, known as "Scrappy." The Bamboo Street house where the shooting occurred was the home of Salas's girlfriend, Maria Pimental. Los Angeles County Sheriff's Deputy Ron Duval, a gang expert, received information that at the end of October or the beginning of November 2002, Salas had been "jumped out" of the Varrio Puente gang. According to Deputy Duval, after a member is jumped out, the gang "still will be out to get [him]" if he is encountered on the street. On December 1, 2002, six days before Rutherford's killing, codefendant Juarez had been shot in the leg, arm and face. After this shooting, Deputy Duval received information that Frank Salas had been the shooter.

At trial the prosecution theory was that defendant conspired with codefendant Juarez and John Rutherford to travel to the Bamboo Street house and kill Frank Salas. However, the plan went wrong, and in the resultant gun battle Salas killed Rutherford. Because defendant makes several challenges to the sufficiency of the evidence (issues we address in the unpublished portion of our opinion), we summarize the evidence in some detail, in the light most favorable to respondent. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

---

[2] Codefendant Juarez's jury acquitted Juarez of all charges.

A. *The Eyewitness Testimony of Danessa and Ismael Ruiz*

When the killing of Rutherford occurred, Danessa Ruiz and her husband, Ismael, were in their residence near Main Street and Dalesford in La Puente. Their home had a view of the Bamboo Street house. Sergeant Gilbert Anderson, who investigated the killing for the Los Angeles County Sheriff's Department, estimated the distance between the Ruiz residence and the Bamboo Street house to be approximately 150 yards.

About 11:30 or 11:45 p.m. on the night of the shooting, Danessa was standing in her second-floor bedroom when she heard approximately six gunshots. She looked through the bedroom window to the Bamboo Street house, and saw two men near a white car stopped in the middle of the street. One of the men walked toward the driveway of the Bamboo Street house, positioned somewhat behind a white car parked in the driveway. He aimed toward the garage, and fired approximately three times. The shooter and the second man shouted to each other, after which they moved along a pathway on the west side of the house. The shooter peered over a gate, then walked or ran east on Bamboo Street. Danessa lost sight of him when he entered a vacant lot. However, he reappeared on the next block over, Main Street, and entered a gate leading to the yard of a residence. Meanwhile, the second man got in the white car, made a U-turn, and drove off westbound on Bamboo.

Danessa's husband, Ismael, was in bed when he heard the first volley, perhaps 10 gunshots. Seconds later, he heard approximately three more shots. He looked out the second-story window, and saw two men near a white car parked at the curb in front of the Bamboo Street house, yelling at each other. One man got in the white car, drove eastbound on Bamboo, made a U-turn, and then drove westbound out of sight. The second man walked fast or ran eastbound on Bamboo, then north through a vacant lot. Ismael lost sight of him for a few minutes, until he emerged on Main Street, where he entered the yard of a home. Soon patrol cars arrived at that location. Danessa and Ismael gave similar descriptions of the clothing worn by the man who fled on foot: grey hooded sweatshirt, dark or black pants, and white tennis shoes or sneakers.

B. *Defendant's Apprehension*

Los Angeles County Sheriff's Deputies received reports of the shooting, and responded to the area immediately. Within five or 10 minutes of the first broadcast, while southbound on Dalesford Street, one block away from Bamboo, Deputy Kenneth Leyva and his partner encountered Brenda Armstrong, who lived at the Bamboo Street house with her sister, Maria

Pimental. Armstrong was on foot, crying and visibly shaken. When Deputy Leyva asked her why she was upset, she replied, "Someone was shot at my house. I think he's dead."

Positioned at the southwest corner of Dalesford and Main Street, Deputy Armando Meneses saw a male Hispanic running south on the east side of Dalesford Street. The man's clothing—hooded grey sweatshirt and dark pants—was consistent with the clothing observed by Danessa and Ismael Ruiz. As the suspect reached the mid block of Dalesford, somewhere between 412 and 430 Dalesford, Deputy Meneses lost sight of him.

Defendant's cousin, Arthur Aguayo, lived with his wife at 412 Dalesford. Two other deputies, Deputies Robert Blunt and Glen Eades, discovered defendant hiding in the driveway of Aguayo's residence, lying partially underneath a parked truck. They took defendant into custody, and Deputy Eades escorted him to a patrol car. While seated in the patrol car, defendant told Deputy Blunt that the location was his cousin's house, and his cousin was expecting him. However, according to Aguayo, although defendant frequently arrived unannounced, Aguayo was not expecting him in the early morning hours when defendant was discovered hiding in the driveway.

## C. *Ballistics Evidence*

Sheriff's deputies found 10 shell casings in the street in front of the Bamboo Street house. They also found impact marks left by at least nine bullets on the front of the house, and several bullet fragments. In the hours after the shooting, in the vacant lot through which the Ruizes had seen one suspect flee, Deputy Peter Shupe discovered a partially loaded .9-millimeter pistol. Ballistics testing showed that this pistol ejected all 10 shell casings found at the scene. The pistol also fired three bullet fragments found on the outside of the house, and one found inside.

In test samples taken from defendant's hands, criminalist Christine Pinto found no gunshot residue. However, she found one particle unique to gunshot primer residue on the front of the sweatshirt defendant was wearing when arrested. Although this finding was consistent with the sweatshirt having been in an environment of gunshot primer residue, it was inconclusive as to whether defendant had fired a gun.

At the Bamboo Street house, responding deputies found John Rutherford's body lying on a small patio toward the rear, just beyond the kitchen door. The cause of Rutherford's death was a single gunshot wound to the chest. The kitchen door had at least two bullet holes. The impact marks and resultant debris were inside the door, indicating that the shots were fired from inside in

a clear line of fire toward Rutherford's body. There was also a bullet impact mark on a fan in the patio near the body, and one on the garage behind.

Deputies found one expended bullet lying on Rutherford's body. The coroner later recovered the fatal bullet. Ballistics testing showed that both bullets were fired by the same .38- or .357-caliber revolver.

Next to Rutherford's body, deputies found a loaded .32-caliber semiautomatic pistol. No .32-caliber shell casings were discovered, indicating that the gun had not been fired. Gunshot primer residue was found on Rutherford's hands. However, according to Christine Pinto, such residue can attach to the hands when they touch a gunshot wound.

### D. *The Wounding of Frank Salas at Bamboo Street*

In the evening of December 7, 2002, Maria Pimental was decorating the Bamboo Street house for Christmas with her sister, Brenda Armstrong, and Pimental's younger nephews. Also present were Pimental's niece and Pimental's friend, Rosalinda Zamora.

Sometime that evening Pimental's boyfriend, Frank Salas, arrived in his silver Honda Accord that he parked in the driveway. About 30 minutes later, Pimental left the house with a niece and nephew to get more decorations, leaving the others, including Salas, at the house. Before returning home Pimental received a telephone call from Rosalinda Zamora. Zamora told her not to go home.[3]

The day after the shooting, December 8, 2002, Detective Sean Heieck received information that a person named Nestor Sanchez, who was in custody for petty theft with a prior conviction, wanted to speak to deputies about a murder on Bamboo Street. In the early evening of December 8, Detective Heieck interviewed Nestor Sanchez at the Sheriff's station in the City of Industry. Sanchez told Detective Heieck "that immediately following the shooting Scrappy [Frank Salas's gang nickname] had come to his residence." Sanchez also said that "Scrappy had been shot in the ankle as a result of a gun battle at the Bamboo house." When asked to identify Scrappy, Sanchez selected a photograph of Frank Salas from a photo six-pack.[4]

---

[3] At trial Zamora denied being at the Bamboo Street house on December 7, 2002, and denied being there when any shooting occurred.

[4] As discussed in the published portion of our opinion, when called as a witness at trial Sanchez did not recall making any statements to Detective Heieck. He was later impeached by Detective Heieck.

### E.  *The Ruizes' Identification Testimony*

The day after the shooting, December 8, 2002, deputies separately showed Danessa and Ismael Ruiz a photo six-pack containing defendant's photograph. Danessa, who had gotten a good look at the shooter's face, circled defendant's photograph. As shown in the photograph, defendant looked like or looked similar to the man she saw shooting. Ismael did not get a good look at the face of the man he saw flee on foot, but did observe "[b]asically the overall form of the person." Ismael circled defendant's photograph in the six-pack, and wrote that the photograph "looks like the guy I saw running on Main Street." Although he was not sure, to the best of Ismael's recollection, the photograph depicted the man he saw flee through the vacant lot.

At trial, shown a photograph of defendant taken at the time of his arrest, neither Danessa nor Ismael recalled the "Dodgers" lettering on defendant's grey hooded sweatshirt. Otherwise, they found the clothing very similar to that worn by the man who fled through the vacant lot.

### F.  *The Activities of Defendant, Codefendant Juarez, and John Rutherford*

Two witnesses, Toni Krone (codefendant Juarez's girlfriend) and Alfredo Garcia (a Varrio Puente gang member) described the activities of Rutherford, defendant, and codefendant Juarez before the shooting, and the conduct of codefendant Juarez in the immediate aftermath.[5]

Alfredo Garcia lived at 1536 North Stimson Avenue, Valinda. In the evening of December 7, 2002, codefendant Juarez drove Krone to Garcia's home in a borrowed white Pontiac. Other testimony showed that Juarez had borrowed the car from a friend, Valerie Aguilar, who had rented it from Enterprise Rent-A-Car. John Rutherford arrived at Garcia's house around the same time as, or perhaps after, codefendant Juarez and Krone. Sometime later codefendant Juarez and Rutherford departed in the borrowed white Pontiac. According to Toni Krone, Juarez said they were going to the store. According to Alfredo Garcia, Rutherford mentioned that he wanted to see a girl, and Juarez offered to drive him.

After Juarez and Rutherford departed, Krone answered a call on Garcia's home telephone. Defendant was on the line, and asked for codefendant Juarez. When Krone told him that codefendant Juarez had left, defendant asked, "Where is he? Do you know where he went?" According to Krone, she told him Juarez had gone to the store.

---

[5] Because Toni Krone was unavailable as a witness (Evid. Code, § 240), the prosecution used her preliminary hearing testimony.

Still later, John Rutherford called Garcia's home. Krone answered, and Rutherford immediately passed the phone to codefendant Juarez. Krone told codefendant Juarez that defendant had called. Juarez said he would return to Garcia's house in a few minutes.

After some time passed, there was yet another telephone call to Garcia's home. According to Krone, Garcia answered. Krone observed him to be shaken, asking, "Who? Who?" He mentioned Rutherford's gang moniker, "Blanco," and referred to calling 911. Krone took the phone. Codefendant Juarez was on the other line, very upset. He said that he thought Blanco had been shot at Bamboo Street, and instructed Krone to call 911. Krone told him she was coming. Rutherford had left his car at Garcia's house. Krone departed in Rutherford's car for Bamboo Street. She knew the area because she had once lived at the Bamboo Street house. Garcia remained behind.

Within 10 minutes or so, codefendant Juarez arrived at Garcia's house in the borrowed white Pontiac. Crying and panicky, he told Garcia that he and Rutherford had driven to Maria Pimental's house on Bamboo Street. Rutherford was just going to say a quick hello while codefendant Juarez remained in the car. As soon as Rutherford walked into the house, codefendant Juarez heard gunshots. Codefendant Juarez exited the car, and saw Rutherford lying on the "floor." With labored breathing, Rutherford asked for help. It was then that codefendant Juarez had called Garcia's house.

After this explanation, codefendant Juarez drove Garcia to Bamboo Street. They arrived around the same time as Krone. As they approached the house on foot, the three were detained by a Sheriff's deputy.

G.   *Cell Phone and Telephone Records*

When defendant was apprehended, he had in his possession a cell phone that was registered to the address where he lived with his parents. Sergeant Gilbert Anderson, the investigating detective, obtained records of calls made and received on that cell phone, as well as records of the cell phones of Rutherford and codefendant Juarez.

The records of the cell phone in defendant's possession showed that before the shooting, defendant called Garcia's home at 11:08 p.m., and then received a call from Rutherford's cell phone at 11:22 p.m. Based on reports of the shooting, Sergeant Anderson surmised that the shooting occurred around 11:53 to 11:55 p.m. At 11:54 p.m., at or near the time of the shooting, defendant called the telephone registered to his parents' home. At 11:55 p.m. he called the cell phone registered to his father. At 12:04 and again at 12:05 a.m. he called the home telephone of his cousin, Arthur Aguayo, in whose driveway deputies discovered defendant hiding.

## H. *Gang Expert Testimony*

Deputy Duval, the prosecution's gang expert, was asked to assume that defendant, codefendant Juarez, and Rutherford traveled to the Bamboo Street house, and that, while Salas was inside, defendant positioned himself at one entrance to the house and fired his pistol. He was also asked to assume that Rutherford, armed with a pistol, positioned himself at the other entrance, but was shot by Salas from inside the residence. Assuming these facts to be true, and also assuming to be true the reports that after being jumped out of the Varrio Puente gang Salas had shot codefendant Juarez, Deputy Duval opined that defendant, codefendant Juarez, and Rutherford traveled to the Bamboo Street house to kill Salas, and to demonstrate to the rest of the Varrio Puente gang that they could "deal with their own."

## I. *Defense Evidence*

Defendant introduced the testimony of Carla Barbosa, a medical assistant for the physician who performed a physical examination on defendant on December 6, 2002. On that date defendant weighed 236 pounds. This weight was inconsistent with the weight (approximately 180 pounds) given in the Ruizes' description of the man they saw flee on foot.

Defendant also called private investigator Richard Beeson. Apparently referring to the distance between the Bamboo Street house and the condominiums where he believed the Ruizes lived on Main Street, Beeson estimated the distance to be approximately 450 to 500 feet.

## DISCUSSION

### I. The Trial Court Properly Admitted Out-of-court Statements of Frank Salas to Nestor Sanchez

Defendant contends that the trial court erroneously admitted Frank Salas's out-of-court statements to prosecution witness Nestor Sanchez. Defendant argues that Salas's statements did not qualify as spontaneous statements under Evidence Code section 1240, and that their use at trial violated defendant's Sixth Amendment right of confrontation under *Crawford v. Washington, supra,* 541 U.S. 36. We find no abuse of discretion in the trial court's implied ruling that the hearsay exception for spontaneous statements

applied. We further hold that Salas's spontaneous statements, made to a person unconnected to law enforcement under circumstances in which Salas could not reasonably anticipate they would be used in court, are not "testimonial."[6]

### A. *Procedural Background*

Outside the presence of the jury, defendant and codefendant Juarez made a hearsay objection to Nestor Sanchez's proposed testimony. In response, the prosecutor made the following offer of proof. While Sanchez was in custody for a theft offense unrelated to the killing of John Rutherford, he asked to speak to a homicide detective about the Bamboo Street shooting. Later that day Sanchez was interviewed by Detective Sean Heieck. Sanchez told Detective Heieck that sometime between December 7 and 8 three "Eastside" gang members came to his home in La Puente. One of them, nicknamed "Scrappy" (Frank Salas's gang nickname) said that he had been shot in the ankle in a shooting at "Gangster's" house (according to the prosecutor, "Gangster" was the gang nickname of Maria Pimental). As described by Scrappy, Scrappy was at the side of the house when the occupants of a white car shot at him. He returned fire, striking one person who fell to the ground. Scrappy tried to get back in the house, but there was no one to let him in. The other people from the white car got in the car, and drove off.

Following this offer of proof, the parties debated whether all or part of Salas's statements to Sanchez were admissible as nonhearsay, or were admissible under the hearsay exceptions for then existing physical state (Evid. Code, § 1250), declaration against interest (Evid. Code, § 1230), and spontaneous statements (Evid. Code, § 1240). The prosecutor anticipated Sanchez would be uncooperative. Nonetheless, to lay a foundation that Salas's description of the shooting qualified as a spontaneous statement, the prosecutor called Sanchez to testify outside the jury's presence. As expected, Sanchez proved uncooperative. Among other things, he testified that he did not recognize Frank Salas's photograph, did not know a "Scrappy," and did not recall making a photographic identification of Salas. He also did not recall telling Detective Heieck that Scrappy came to his home in December 2002 and said he had been shot in the ankle at Gangster's house.

---

[6] The issue whether spontaneous statements made to police officers are testimonial is currently pending before the California Supreme Court in *People v. Cage*, review granted Oct. 13, 2004, S127344.

All parties and the court agreed that to the extent Salas told Sanchez simply that he had been wounded in the ankle, his statement would be admissible under the hearsay exception for statements of then existing physical state.[7] However, the trial court expressed concern about the spontaneous statement exception and the possible time lapse between the shooting and Salas's description of the shooting to Sanchez. Following Sanchez's testimony outside the jury's presence, the prosecutor suggested that given the court's concern with the spontaneous statement exception, he would only seek to impeach Sanchez "on the statement against present physical condition [sic]." He would then later see if he could "figure out how to handle the legal issue," apparently referring to the question whether Salas's larger description of the shooting qualified under the spontaneous statement exception. The trial court agreed that this suggestion was reasonable as to the "one statement relating to the hole in the ankle." Defendant's counsel also agreed.

Thereafter, called as a witness by the prosecutor in the jury's presence, Sanchez admitted being in custody for petty theft with a prior conviction around December 8, 2002. He also admitted being a former member of the Eastside Puente gang. However, he denied knowing Frank Salas, did not recognize Salas's photograph, and could not identify his initials under Salas's photograph in a photographic lineup. He also denied knowing a person nicknamed Scrappy. He did not recall asking to speak to Sheriff's deputies. He also did not recall telling Detective Heieck that Scrappy had come to his house in the early morning hours of December 8, 2002, with a gunshot wound to the ankle, and did not recall telling Detective Heieck that Scrappy said he had been shot in the ankle.

Four days later in the trial, to testify to Sanchez's prior inconsistent statements, the prosecutor called Detective Heieck. Under questioning by the prosecutor, Detective Heieck testified that on December 8, 2002, he received information that a person named Nestor Sanchez, who was in custody for petty theft with a prior conviction, wanted to speak to deputies about a murder on Bamboo Street. In the early evening of December 8, Detective Heieck interviewed Sanchez at the Sheriff's station in the City of Industry. Over the hearsay objection of counsel for defendant, Detective Heieck was permitted to testify that Sanchez "told [him] that immediately following the shooting Scrappy had come to his residence." Also over defendant's hearsay objection, Detective Heieck was permitted to testify that Sanchez said

---

[7] In relevant part, Evidence Code section 1250 provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing . . . physical sensation (including a statement of . . . pain, or bodily health) is not made inadmissible by the hearsay rule, when: [¶] (1) The evidence is offered to prove the declarant's . . . physical sensation at that time or at any other time when it is itself an issue in the action . . . . [¶] . . . [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

"Scrappy had been shot in the ankle as a result of a gun battle at the Bamboo house." Without objection Detective Heieck also testified that when asked to identify Scrappy, Sanchez selected Salas's photograph from a six-pack, placed his initials under the photo, and signed the photographic identification admonition form.

### B. Salas's Out-of-court Statements Qualified as Spontaneous Statements Under Evidence Code Section 1240

Through Detective Heieck's trial testimony, the prosecutor elicited two levels of out-of-court statements: first, the level on which Nestor Sanchez spoke to Detective Heieck; second, the level on which Frank Salas spoke to Nestor Sanchez. Of course, the first level, Sanchez-to-Heieck, was admissible under Evidence Code section 1235, the hearsay exception for prior inconsistent statements of a witness. It is the second level, Salas-to-Sanchez, that creates the issue we address.

Technically speaking, in the jury's presence Detective Heieck never referred to this Salas-to-Sanchez level of hearsay. That is, he did not testify that *Scrappy told Sanchez* a shooting had occurred "immediately" before Scrappy came to Sanchez's residence. He also did not testify that *Scrappy told Sanchez* he had been shot in the ankle in a gun battle at the Bamboo Street house. Nonetheless, from the prosecutor's offer of proof in the trial court, it is clear that Sanchez's knowledge of these matters came from Salas's statements, and Detective Heieck had no independent knowledge of them. Thus, Detective Heieck's trial testimony implicitly described Salas's out-of-court statements to Sanchez. We therefore treat Detective Heieck's testimony as containing double-tiered hearsay: Salas to Sanchez, and Sanchez to Heieck.

From the prosecutor's offer of proof, it is also clear only a small portion of what Salas told Sanchez was ultimately introduced at trial. In the trial court the prosecutor relied on the spontaneous statement exception in seeking introduction of Salas's full description of the shooting. The court and the parties agreed that Salas's bare reference to being wounded in the ankle was admissible as a statement of then existing physical state under Evidence Code section 1250. However, during Detective Heieck's trial testimony, the prosecutor elicited *more* than that bare reference. He elicited the additional details that Salas arrived at Sanchez's house "immediately following" the shooting, and that Salas had been shot in the ankle "as a result of a gun battle at the Bamboo house." Because such details describe the cause of Salas's wound and the timing of the shooting, they fall under subdivision (b) of Evidence Code section 1250, which excludes evidence of the declarant's memory of the condition-causing event. (See *People v. Deeney* (1983) 145 Cal.App.3d 647, 652 [193 Cal.Rptr. 608].)

In overruling defendant's hearsay objections to Detective Heieck's testimony containing these additional out-of-court details, the trial court did not expressly invoke the spontaneous statement exception. However, given the prosecutor's reliance on that exception to justify the introduction of Salas's description of the shooting, we infer, as does defendant on appeal, that the trial court ruled Salas's out-of-court statements admissible as spontaneous statements under Evidence Code section 1240.

"To come within the spontaneous statement exception to the hearsay rule, an utterance must first purport to describe or explain an act or condition perceived by the declarant. (Evid. Code, § 1240, subd. (a).) Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception. (*Id.*, subd. (b).)" (*People v. Farmer* (1989) 47 Cal.3d 888, 901 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) " 'The foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082].) It lies within the sound discretion of the trial court to determine whether these foundational requirements are met. (*Id.* at pp. 318–319.)

As required by Evidence Code section 1240, Salas's out-of-court statements described an event Salas personally perceived: being shot in the ankle during a gunfight at Bamboo Street "immediately" before traveling to Nestor Sanchez's home. However, defendant contends that there was insufficient evidence to show that Salas spoke to Sanchez while under the stress of excitement caused by the shooting. We find that the record amply supports the trial court's implied finding that this requirement was met.

The question of Salas's mental state cannot be divorced from the larger picture of the prosecution's evidence, and the reasonable inferences to be drawn from it. Even without considering Salas's statements, there is no doubt that near midnight on December 7, 2002, a violent gun battle occurred at the Bamboo Street house, resulting in the death of John Rutherford. Danessa Ruiz heard approximately six shots, and immediately thereafter saw a gunman fire perhaps three more shots in the direction of the Bamboo Street house. Her husband, Ismael, heard a first volley of around 10 shots, and a second volley of approximately three shots. From the Ruizes' observations and the ballistics evidence, it is clear that one gunman, armed with

a .9-millimeter semiautomatic pistol, fired at the front of the Bamboo Street house. A second gunman, using a .38- or .357-caliber pistol, killed John Rutherford from inside the house by shooting through the rear kitchen door. Rutherford himself was armed with a gun, a loaded .32-caliber pistol, which apparently was not fired.

The trial court could reasonably conclude that this violent event was likely to cause sustained stress in participants like Frank Salas. Thus, when codefendant Juarez telephoned the residence of Alfredo Garcia shortly after the shooting, he was extremely upset. According to Alfredo Garcia, Juarez was in the same emotional state when he later arrived at Garcia's house. Similarly, in the aftermath of the shooting, when deputies encountered Barbara Armstrong, a resident of the Bamboo Street house, on foot on Dalesford Street, they found her crying and visibly shaken.

Viewed against this background, there is adequate evidence from which a reasonable trial court could conclude that Salas made his statements to Sanchez spontaneously, while under the stress of excitement caused by the confrontation at Bamboo Street. Sergeant Gilbert Anderson, the investigating detective, testified that the shooting likely occurred around 11:53 to 11:55 p.m. on December 7, 2002. Detective Heieck spoke to Sanchez the next day, December 8, in the early evening, after Sanchez had been arrested on a theft-related charge. Sanchez told Detective Heieck that Scrappy had come to his house "immediately following" the shooting (information provided by Salas himself), thus placing the timing of Salas's statements in close temporal proximity to the gun battle. Moreover, the ankle wound having only been recently inflicted, it may reasonably be inferred that Salas was still experiencing its effects. Further, Salas's out-of-court statements elicited at trial do not suggest deliberation or reflection, but rather merely a brief recitation of the essential facts of the event—being shot in the ankle during a gun battle at Bamboo Street. No suspect was named, no motive proffered, no description recited of other events, real or imagined.

■ Defendant notes that the record discloses no specific evidence of the time of day Sanchez spoke to Salas, no specific evidence of what Salas did between the shooting and arriving at Sanchez's home, no specific evidence of Salas's emotional state. However, the absence of such evidence does not lead to the conclusion that the trial court abused its discretion. Because the requirement that the declarant be under the stress of excitement "relates to the peculiar facts of the individual case . . . [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met." (*People v. Poggi, supra,* 45 Cal.3d at pp. 318–319.) Although evidence of

interceding events (if any) and direct observations of the declarant's emotional state are helpful in determining whether the declarant is speaking under the stress of excitement, such evidence is not in all cases essential. Regardless of the nature or source of the foundational evidence, the trial court's finding on the issue must be upheld if the foundational evidence is substantial. (*People v. Brown* (2003) 31 Cal.4th 518, 541 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) Despite the absence of detailed evidence of Salas's activities before he came to Sanchez's home, and despite the absence of specific observations of Salas's emotional state when he spoke to Sanchez, we find substantial evidence supports the trial court's implied finding that Salas spoke while under the stress of excitement caused by being wounded in the Bamboo Street shooting.

### C. *Use of Salas's Statements Did Not Violate the Sixth Amendment*

■ Determining that Salas's statements were admissible under state law as spontaneous statements does not end the discussion. As defendant observes, out-of-court statements admissible under state-law hearsay exceptions may nonetheless violate the confrontation clause of the Sixth Amendment as recently construed in *Crawford v. Washington, supra,* 541 U.S. 36. In *Crawford* the Supreme Court held that the confrontation clause precludes the use of "testimonial" hearsay against the defendant in a criminal trial, unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at p. 68.) The court departed from the analysis of *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], which had construed the confrontation clause to permit the use of hearsay if it possessed "adequate 'indicia of reliability' " (448 U.S. at p. 66), meaning that the out-of-court statement fell within a "firmly rooted hearsay exception" or had "particularized guarantees of trustworthiness" (*ibid.*).

■ Respondent contends that by failing to make a specific Sixth Amendment objection below, defendant has forfeited the right to invoke *Crawford* on appeal. However, *Crawford* was decided after defendant's trial, and was an unanticipated departure from the high court's established Sixth Amendment jurisprudence. (See *People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1400 [13 Cal.Rptr.3d 753] [*Crawford* stated new rule on effect of confrontation clause on hearsay in criminal cases].) "Though evidentiary challenges are usually waived unless timely raised in the trial court, this is not so when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change. [Citations.]" (*People v. Turner* (1990) 50 Cal.3d 668, 703 [268 Cal.Rptr. 706, 789 P.2d 887].) We find

defendant's failure to make a specific Sixth Amendment objection does not forfeit the claim that admission of Salas's out-of-court statements violated the confrontation clause under *Crawford.*

■ Addressing the merits of defendant's contention, we find no constitutional violation. At the outset, we note that use of the Sanchez-to-Heieck level of hearsay does not implicate the Sixth Amendment. As stated in *Crawford,* "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford v. Washington, supra,* 541 U.S. at p. 59, fn. 9.) Here, Sanchez testified at trial and was available for cross-examination concerning the circumstances of his out-of-court statements to Detective Heieck. Thus, there is no Sixth Amendment issue in the use of those out-of-court statements for the truth of the matter asserted. The sole issue is whether use of the Salas-to-Sanchez level of hearsay violated *Crawford.*

■ In *Crawford* the court found the meaning of the confrontation clause best expressed in the English common law antecedents of the clause and in colonial practices and decisions generally contemporaneous with the clause. (*Crawford v. Washington, supra,* 541 U.S. at pp. 42–51.) The court's historical review led to two conclusions. First, "the principal evil at which the confrontation clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." (*Id.* at p. 50.) Historically, such "*ex parte* examinations" were conducted by judicial officers or other government officials, the defendant not being present and having no right to confront the witness. (*Ibid.*) This historical perspective, as well as the text of the clause, "reflect[ed] an especially acute concern with a specific type of out-of-court statement" (*id.* at p. 51), that is, a "testimonial" statement (*ibid.*). The second conclusion drawn by the court was "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53–54.)

The court declined to provide "a comprehensive definition of 'testimonial.' " (*Crawford v. Washington, supra,* 541 U.S. at p. 68.) However, it did provide certain minimum guidelines: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Id.* at p. 68.) In referring to "police interrogations," the court "use[d] the term 'interrogation' in its colloquial, rather than any technical legal, sense." (*Id.* at p. 53, fn. 4.) Moreover, besides these discrete categories, the court also provided some suggestive, less defined

guidelines. Thus, the court discussed the definitions of the term "testimonial" proffered in the *Crawford* briefing and in Justice Thomas's concurring opinion in *White v. Illinois* (1992) 502 U.S. 346, 365 [116 L.Ed.2d 848, 112 S.Ct. 736] (conc. opn. of Thomas, J.). The court stated: "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]. These formulations all share a common nucleus and then define the clause's coverage at various levels of abstraction around it." (*Crawford, supra,* 541 U.S. at pp. 51–52.)

■    Beyond this discussion of what *is* testimonial, *Crawford*'s reasoning provides guidance as to what is *not* testimonial. *Crawford* distinguished "[a]n off-hand, overheard remark" from "the civil-law abuses the Confrontation Clause targeted." (*Crawford v. Washington, supra,* 541 U.S. at p. 51.) Also, the court observed that the text of the clause referred "to 'witnesses' against the accused—in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (541 U.S. at p. 51.)

In discussing the holding of *White v. Illinois, supra,* 502 U.S. 346, a "case arguably in tension" with *Crawford* because it upheld introduction of "statements of a child victim to an investigating police officer . . . as spontaneous declarations" (*Crawford v. Washington, supra,* 541 U.S. at p. 58, fn. 8), the court strongly implied that statements qualifying under that historical hearsay exception were not testimonial. The court stated: "It is questionable whether testimonial statements would ever have been admissible on that ground [spontaneous declarations] in 1791; to the extent the hearsay exception for spontaneous declarations existed at all, it required that the statements be made 'immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.' [Citation.]" (*Ibid.*) The court gave other examples of nontestimonial statements. Thus, the court noted that historical exceptions to the hearsay rule did not expand the scope of out-of-court statements admissible against a criminal defendant,

because "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." (*Id.* at p. 56.) The only deviation was the exception for dying declarations, and the court declined to decide whether the Sixth Amendment incorporated this hearsay exception so as to permit use of testimonial statements. (541 U.S. at p. 56, fn. 6.)

From *Crawford*'s reasoning, we conclude that Salas's out-of-court statements are not testimonial. They are not similar to *Crawford*'s concrete examples of testimonial statements: prior testimony and police interrogations. It bears repeating that we are not here concerned with the Sanchez-to-Heieck level of hearsay. Although Sanchez's out-of-court statements to Detective Heieck resulted from police interrogation, Sanchez appeared for cross-examination at trial, and use of his out-of-court statements at trial raises no issue under the confrontation clause. (*Crawford v. Washington, supra,* 541 U.S. at p. 59, fn. 9.) Further, Salas's statements lacked any degree of legal or procedural formality. Rather, Salas spoke to a civilian, Sanchez, at Sanchez's home in the immediate aftermath of a shooting—a shooting in which Salas himself was wounded. Salas could not reasonably have anticipated that Sanchez, a former gang member, would relate the statements to law enforcement, or that the statements would somehow be used in court. Moreover, as we have held, Salas's statements qualify as spontaneous statements under Evidence Code section 1240, the requirements of which are largely identical to the common law hearsay exception for spontaneous declarations as described in *Crawford.* That is, substantial evidence supports a finding Salas spoke " 'immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.' [Citation.]" (*Crawford, supra,* 541 U.S. at p. 58, fn. 8.) Such a statement, *Crawford* strongly implies, is not testimonial.

■ We thus conclude that Salas's out-of-court statements, qualifying as spontaneous statements under Evidence Code section 1240, made to a civilian unconnected to law enforcement under circumstances in which Salas could not reasonably anticipate they would be used in court, are not testimonial under *Crawford.* Use of those statements against defendant at trial did not violate the Sixth Amendment.

## II.–VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 738.

## DISPOSITION

The sentence enhancements imposed on counts 1 and 2 under section 12022.53, subdivisions (c) and (b), are stricken, and the matter is remanded for resentencing consistent with this opinion. In all other respects the judgment is affirmed.

Epstein, P. J., and Curry, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 17, 2005. Werdegar, J., did not participate therein.