Filed 12/15/14  P. v. Carrillo CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO CARRILLO,<br><br>    Defendant and Appellant. | 2d Crim. No. B245720<br>(Super. Ct. No. 1333854)<br>(Santa Barbara County) |

Alejandro Carrillo appeals his conviction by a jury for the first degree murder of Pedro Gonzalez (Pen. Code §§ 187[1], subd. (a)/189 – count 1), being a felon in possession of a gun (former § 12021, subd. (a)(1), now § 29800, subd. (a) – count 5), being a felon in possession of controlled substances while armed with a gun (Health & Saf. Code, §§ 11370.1, subd. (a) – count 6), possessing controlled substances in a jail (§ 4573.6) – count 7), and possessing a "shank" while in custody (§ 4502, subd. (a) – count 8).  The charges include gang and firearm enhancements. (§§ 12022.53, subd. (d); 186.22, subd. (b)(1).)  Carrillo was found not guilty of torturing and committing aggravated mayhem on Victor Ramirez and attempting to murder him (§§ 206, 205, 187, subd. (a) – counts 2, 3, and 4).  Carrillo was

---

[1] All statutory references are to the Penal Code unless stated otherwise.

sentenced to 50 years to life on count 1 and to consecutive determinate terms totaling 13 years on counts 5, 6, 7 and 8. Carrillo contends that it was error for the court to permit witnesses to testify about statements made by gang members Michael Sauceda and Rubin Flores that inculpated him in the murder of Gonzalez. We affirm.

FACTS AND PROCEDURAL BACKGROUND

*The People's Case*

Carrillo was the leader of the Southside Sureño criminal street gang in Guadalupe. Anthony Melena, Ana Rodriguez, Miros Murguia, Stacy Araujo, Michael Sauceda and Pedro Gonzalez were members of the gang. All those connected with the Sureño gang used and sold drugs. A portion of the proceeds from their drug sales had to be sent to the Mexican Mafia through Flores and everyone who sold drugs in Santa Barbara County had to pay a $500 per month "tax" for the privilege of doing so. Sauceda assisted Carrillo in collecting the taxes and other monies due to Flores and the Mexican Mafia.

Flores was the leader of the Westside gang in Santa Barbara and a member of the Mexican Mafia. He controlled the drug trade in Santa Barbara County. Flores claimed he was authorized by the Mexican Mafia to order persons to be murdered. Pedro Gonzalez was murdered in the early morning hours of February 15, 2010.

On February 13, 2010, Carrillo met with Melena and asked him to help him "smoke a paisa." While there, Carrillo called Flores and was given permission "to take care of" Gonzalez. Melena refused Carrillo's request.

On February 14, 2010, Ana Rodriguez hosted a "BBQ" at her home. Carrillo and Sauceda borrowed Stacy Araujo's white Suburban to bring the grill to Rodriguez's home. Gonzalez was later murdered in Araujo's car and the BBQ was used to burn Carrillo's clothing.

Murguia arrived at Rodriguez's home about 8:00 p.m. She argued with Carrillo about money which agitated him. Murguia left the BBQ about 10:00

2

p.m. to return home but later sent a text message to Carrillo asking him for some drugs. Carrillo went to Murguia's home in response to her call and while there, Carrillo used Murguia's telephone to call Gonzalez. He left Murguia's house and returned a short time later with Gonzalez.

Sauceda drove Araujo's Suburban to Murguia's house to deliver some food from the BBQ and check on Murguia's well-being because he knew appellant was upset with her. He arrived about midnight and overheard Carrillo and Gonzalez arguing. Carrillo told Saucedo to drive him and Gonzalez to Rodriguez's house. After leaving Murguia's house, Carrillo and Gonzalez continued to argue. The argument ended when Carrillo shot Gonzalez in the head. Carrillo and Sauceda dumped the body in a field and then returned to Rodriguez's home. Carrillo stripped off his clothing and he and Sauceda burned it in the BBQ. Sauceda then told Rodriguez and Murguia about how Carrillo murdered Gonzalez. Gonzalez's blood and gunshot residue were found in Araujo's car.

Later, during an unrelated investigation, Flores told Paul D'Angelo, an undercover agent of the Bureau of Alcohol, Tobacco and Firearms ("BATF"), that he paid Gonzalez $3,600 for methamphetamine but that what Gonzalez gave him was not meth. Flores told D'Angelo that he asked his associate "to kill a paisa in Guadalupe who sold him some bunk dope." This conversation was secretly recorded.

When he was arrested on February 28, 2010, Carrillo was armed with a gun loaded with five hollow-point bullets and a sixth spent cartridge.

*The Defendant's Case*

Becky Zepeda was Gonzalez's step child. She spoke of her romantic relationship with Carrillo. The police asked Zepeda to place a secretly recorded telephone call to Carrillo. She asked him several times if he was involved in Gonzalez's murder. He denied it and said he was innocent.

Sauceda was interviewed by a defense investigator in November 2010. Sauceda told the investigator that he did not see Gonzalez murdered, said

3

nothing to Rodriguez or Murguia about it and heard nothing from anyone else about the crime. In another interview from prison, Sauceda again denied seeing anything or saying anything about the murder and said Rodriguez and Murguia were lying.

*Statements of Sauceda and Flores about the Murder*

*Sauceda's Statements*

Sauceda was arrested in December 2010 and was charged with murdering Gonzalez. He pled guilty to being an accessory after the fact and admitted the gang enhancement. He was sentenced to three years, four months in prison. When called to testify, Sauceda refused to answer questions.

Rodriguez was called to testify at Carrillo's trial. She was granted use immunity and charges filed against her for selling narcotics and of being an accessory to murder were dismissed. Milos Murguia also testified and she too agreed to testify truthfully in exchange for use immunity and dismissal of the charge of being an accessory to murder.

Over Carrillo's objection, Rodriguez and Murguia were permitted to testify about what Sauceda said to them after Gonzalez was murdered. Rodriguez testified that she saw Carrillo and Sauceda when they returned to her house in Araujo's car and saw them go into her garage and then heard them arguing heatedly. When she went to investigate, Carrillo was removing his clothing. When she asked Sauceda what was going on, Sauceda told her that when he arrived at Murguia's house Carrillo and Gonzalez were there. Sauceda said Carrillo and Gonzalez walked over to Araujo's white Suburban and Gonzalez was forced or told to get in. Sauceda stated Carrillo told him to get in the car and drive them to Rodriguez' home. Sauceda told her that Carrillo and Gonzalez continued to argue in the car in Spanish and said that he heard Gonzalez repeatedly say that what Carrillo was saying was not true. Sauceda said the argument ended suddenly when Carrillo shot Gonzalez in the head, killing him. Sauceda said, "I can't believe what [Carrillo] has done." Later, Sauceda told Rodriguez that he and Carrillo burned Carrillo's clothing and a mop in the BBQ and then cleaned out the BBQ.

4

On the day Gonzalez was murdered, Sauceda also responded to questions from Murguia. She testified that Sauceda told her that Carrillo and Gonzalez had been arguing and that Sauceda told her "we went to the fields and [Carrillo] blew his brains out." Sauceda told Murguia that he did not know what the argument was about because he was not fluent in Spanish.

Sauceda, Rodriguez and Murguia were close friends. Rodriguez had known Sauceda since he was three years old. She permitted Sauceda, Carrillo and other gang members to gather at her house from time to time to drink and use drugs. Murguia was a good friend of Sauceda and a childhood friend of Carrillo.

*Flores' Statements*

Flores was under investigation by the "FBI," the BATF and state law enforcement agencies. Operating undercover, Special Agent Paul D'Angelo of the BATF purchased methamphetamine, cocaine, firearms and stolen property from Flores. Flores was unaware D'Angelo was secretly recording the transactions. During one of their meetings, Flores spoke of his purchase of fake methamphetamine from Gonzalez, said he ordered Carrillo to kill Gonzalez and that Carrillo complied. Specifically, Flores said that Carrillo "popped a homeboy" as a favor to him. Flores said that he had been ripped off in a drug sale because the methamphetamine he purchased for $3,600 was fake. Flores said he was authorized by the Mexican Mafia "to order a hit," and that he had done so. Flores told agent D'Angelo that he knew Carrillo had been arrested and said he believed Carrillo was cooperating with police and believed Carrillo's incarceration was "protective custody." Agent D'Angelo said he believed Flores was being truthful.

By the time of trial, Flores was serving a 19-year prison sentence. He refused to be sworn and declined to testify.

DISCUSSION

Where, as here, a person who is unavailable as a witness inculpates himself and another person in conversations with friends or fellow gang members, his statements, if trustworthy, are admissible. Such statements are declarations

5

against penal interest, are not "testimonial," and their admission does not violate the confrontation clause. (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).)

We review the trial court's ruling permitting Rodriguez, Murguia and D'Angelo to recount Sauceda's and Flores' out-of-court statements for an abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.) To avoid a violation of Carrillo's Sixth Amendment right to confrontation and cross-examination, the statements must be "nontestimonial." To be admissible, they must be trustworthy and against the declarant's penal interest. (*People v. Leach* (1975) 15 Cal.3d 419, 441-442.)

*Sauceda's and Flores' Out of Court*
*Statements – Confrontation Clause*

Carrillo contends that Sauceda's statements to Rodriguez and Murguia and Flores statements to D'Angelo are testimonial hearsay. He argues that admitting this evidence violated his Sixth Amendment right to confront and cross-examine the witnesses against him. (See *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176.) We disagree.

In *Crawford,* the United States Supreme Court described testimonial hearsay as "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior "testimony" that the defendant was unable to cross-examine, or . . . 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Crawford*, *supra*, 541 U.S. at pp. 51-52.) Pursuant to *Crawford,* out-of-court statements can be divided into police interrogations ("testimonial" hearsay) and statements in which no interrogation takes place ("nontestimonial" hearsay). (*Id*., at pp. 52-53.) Nontestimonial hearsay is subject only to "traditional limitations upon hearsay evidence" and does not implicate the Sixth Amendment right of confrontation. (*Davis v. Washington* (2006) 547 U.S. 813, 821; see *People v. Cooper* (2007) 148 Cal.App.4th 731, 740-741.)

6

Informal conversations have been repeatedly held to be nontestimonial.  (See *People v. Cage* (2007) 40 Cal.4th 965, 986-987 [statements to a treating physician]; *People v. Rincon* (2005) 129 Cal.App.4th 738, 757 [statement to a friend].)

Sauceda's excited account of the unexpected killing by Carrillo was given to two close friends who were also gang members and drug dealers under circumstances that he could not reasonably have believed would be used later in trial.  (See *U.S. v. Summers* (10th Cir. 2005) 414 F.3d 1287, 1302 [proper focus is whether the declarant believes the statement will be used as evidence].)  The last thing on Sauceda's mind was that his remarks would be relayed to law enforcement or repeated in court.  A statement is not testimonial unless its primary purpose is "to establish or prove past events potentially relevant to a later criminal prosecution." (*Davis v. Washington*, *supra*, 547 U.S. at p. 822; *Michigan v. Briant* (2011) 562 U.S. 344 -- [131 S.Ct. 1143, 1154].)

Similarly, the last thing on Flores' mind was that his conversation with D'Angelo about drugs, guns, stolen property and murder would later be repeated in court.  In *Davis v. Washington, supra,* 547 U.S. at page 825, the court gave examples of nontestimonial statements—"statements made unwittingly to a Government informant" and "statements from one prisoner to another[.]"  (See also *People v. Arauz* (2012) 210 Cal.App.4th 1394 [statements made to an informant unwittingly are not testimonial].)

Flores thought he was talking to other gangsters and had no idea his remarks were being monitored and videotaped and would be used in subsequent legal proceedings.  (See *U.S. v. Tolliver* (7th Cir. 2006) 454 F.3d 660, 665; *U. S. v. Underwood* (11th Cir. 2006) 446 F.3d 1340, 1347-1348; *U. S. v. Hendricks* (3rd Cir. 2005) 395 F.3d 173, 182-184; *U. S. v. Saget* (2d Cir. 2004) 377 F.3d 223, 229-230; *U.S. v. Smalls* (10th Cir. 2010) 605 F.3d 765, 778 [prisoner's recorded statement to a fellow prisoner who was actually a government informant is "unquestionably nontestimonial"].)  We agree with the rule and rationale of these

7

cases. We conclude that Flores' statements unwittingly made to D'Angelo and a confidential informant are not "testimonial" within the meaning of the confrontation clause.

*Sauceda's and Flores' Out of Court*

*Statements – Declaration against Penal Interest*

Carrillo contends the trial court erred in admitting Sauceda's and Flores' out-of-court statements as a declaration against penal interest. (Evid. Code, § 1230.) He argues that the statements were not "trustworthy" or "reliable" and that "[u]nder the rule of [*People v. Leach* (1975) 15 Cal.3d 419], a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citations.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 612.)

"There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.)

In *People v. Duarte*, *supra,* 24 Cal.4th 603, Morris and defendant committed a drive-by shooting. After arrest, Morris told the police that he did not want to kill anybody and "shot high" to avoid harming anyone. (*Id*., at p. 613.) The Supreme Court concluded that the statement lacked trustworthiness and was not "'specifically disserving'" of Morris' penal interest. (*Ibid.*) Unlike *Duarte*, Sauceda and Flores were not describing the killing to a police officer. They were describing the order for a "hit" and the murder that followed with close friends, trusted gang members or partners in an illegal transaction involving the sale of drugs, guns and stolen property.

8

Sauceda did not say what he said to Rodriguez for the primary purpose of shifting responsibility to Carrillo, knowing that his account would be passed along by Rodriguez and Murguia to law enforcement. The "context" (*People v. Duarte*, 24 Cal.4th at p. 613) is particularly compelling and augers in favor of admissibility. Sauceda described what he saw and then helped cover up the crime by burning Carrillo's clothing and disposing of the ashes. He was candid about his role in the shooting and Sauceda's statements were "'so far contrary to [his] interests "that a reasonable man in his position would not have [said it] unless he believed it to be true."'" [Citations.]" (*People v. Brown* (2003) 31 Cal.4th 518, 536.)

As in *People v. Arauz*, *supra*, 210 Cal.App.4th 1394, Flores' remarks were candid and in no way self-exonerating. Flores recited the reason he wanted Gonzalez killed, how he gave the assignment to his associate Carrillo and how Carrillo carried out his order by "popping" Gonzalez. Although there may have been some inconsistencies in what Flores said and what others claimed, there is ample evidence in the record to support the trial court's finding that Flores' remarks were against his penal interest.

Sauceda's and Flores' "facially incriminating comments" implicating themselves and Carrillo "were in no way exculpatory." (*People v. Samuels* (2005) 36 Cal.4th 96, 120.) Their detailed statements were to someone they thought was safe. Sauceda's and Flores' statements were "inextricably tied to and part of a specific statement against penal interest." (*Id*., at p. 121.) Such specificity, including naming Carrillo as the actual shooter, shows "trustworthiness." The trial court did not err in finding that the statements implicating themselves and Carrillo were "specifically disserving," and thus admissible as a declaration against penal interest. (*People v. Cervantes*, *supra*, 118 Cal.App.4th at pp. 171, 176.)

We have considered other arguments advanced by Carrillo and conclude that none of them warrant further discussion.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

BURKE, J.[*]

We concur:

YEGAN, Acting P. J.

PERREN, J.

---

[*] (Judge of the Superior Court of San Luis Obispo County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.)

James F. Rigali, Judge

Superior Court County of Santa Barbara
_____


Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Joseph P. Lee, Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.