Filed 5/26/26  P. v. Renfroe CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087171 |
| Plaintiff and Respondent, | (Super. Ct. No. RIF2105455) |
| v. | |
| JAMES DAVID RENFROE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Rene Navarro, Judge.  Affirmed in part, reversed in part, and remanded.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted James David Renfroe of one count of raping a child (Jane Doe) under the age of 14 and seven or more years younger than him

(Pen. Code,[1] § 269, subd. (a)(1)) (count 1); one count of sexual penetration by force upon a child (Jane Doe) under the age of 14 and seven or more years younger than him (§ 269, subd. (a)(5)) (count 2); and one count of committing a lewd act by force on a child (Jane Doe) under the age of 14 (§ 288, subd. (b)(1)) (count 3).  The trial court sentenced Renfroe to an indeterminate prison term of 30 years to life, composed of two consecutive terms of 15 years to life for count 1 and count 2.

Renfroe contends that (1) the trial court prejudicially erred in admitting two exhibits containing writings composed by Jane Doe relating to Renfroe's sexual assault; and (2) insufficient evidence supports the conviction for sexual penetration by force upon a child in count 2.

We conclude that the trial court did not prejudicially err in admitting the two exhibits that contained Jane Doe's writing.  However, the conviction for sexual penetration by force upon a child (§ 269, subd. (a)(5)) must be reversed because it is not supported by substantial evidence.  We accordingly reverse the conviction in count 2, and we remand for resentencing on counts 1 and 3.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In early 2021, when Jane Doe was 11 years old, she attended a backyard gathering at the home of family friends where Renfroe was also present.  Renfroe was 34 years old at the time.  Jane Doe did not know Renfroe well, having possibly met him on only one prior occasion.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]     Renfroe also challenges the trial court's imposition of consecutive sentences for counts 1 and 2.  However, due to our disposition reversing the conviction in count 2, we need not address that issue.

According to Jane Doe's trial testimony, when she walked into the house to go to the bathroom, Renfroe followed her inside. After Jane Doe entered the bathroom, Renfroe pushed open the bathroom door, entered the bathroom, and locked the door. Renfroe pulled down his pants and pushed Jane Doe to the floor. Renfroe then raised Jane Doe's shirt and sports bra and put his hands on her chest. According to Jane Doe, Renfroe also "had his hand in my pants." Renfroe then pulled down Jane Doe's pants. As Jane Doe testified, "He was touching that area, trying to feel around while his pants were down." Specifically, "He was looking and rubbing his hands over my butt and the front, where my vagina is." Jane Doe explained that "it hurt" because Renfroe "was applying a lot of pressure" and "his hands were big." The prosecutor asked Jane Doe, "Did anything penetrate your vagina . . . from his hand?" Jane Doe replied, "No."

Next, Renfroe forced his penis inside of Jane Doe's vagina and moved it in and out. Jane Doe protested and tried to push Renfroe off and squirm away, but Renfroe continued with the rape. Renfroe eventually stopped and pulled up his pants. Before Renfroe left the bathroom, he threatened that if Jane Doe told anyone about what happened, he would kill her and her family. Jane Doe got dressed, stopped crying, and rejoined the gathering in the backyard. She did not say anything about what had happened. According to Jane Doe, she had red marks on her body where Renfroe was squeezing her but no other injuries or bleeding.

After she got home from the gathering and had taken a shower, Jane Doe wrote an entry in her journal.[3] The journal entry, admitted into evidence as Exhibit 1, stated:

---

[3] We have set forth the text of Jane Doe's writings as they appear in the physical exhibits introduced at trial, although for readability we have

3

"James Bathroom . . . WHY!  Is this okay?  Can he actually do this?  This doesn't feel right.  He followed me to the bathroom.  He grabbed me and thr[ew] me to the ground.  Did I do something?  He touched my boobs.  He's on top of me and I couldn't do a[n]ything.  I couldn't even move him off.  He put his penis inside my crotch.  It hurt so so bad.  Why is he doing this to me?  Did I say something bad?  Is he even allowed to do this.  He put his hand over my mouth, I couldn't talk.  I was crying so hard.  I was so u[nc]omfortable.  I begging [sic] for him to stop but he didn't.  Why is he doing this.  It really really hurts.  He's choking me.  I couldn't move.  I was just frozen.  He finally stopped after 15 minutes.  It hurts so bad and my mouth is red.  He grabbed my arm, w[h]ispered in my ear that if I told anyone he would kill me and my family.  I washed up and adjusted my clothes.  I forced myself to stop crying.  I thought he was a nice person.  Why would he do this."[4]

Approximately "a couple of weeks" later, Jane Doe wrote about the incident again, after having "multiple nightmares."[5]  A significant part of that writing consisted of lyrics from a song that Jane Doe located when

---

changed some of the capitalization at the beginning of sentences, added apostrophes in certain contractions, and corrected spelling as indicated by brackets.

[4]    During the trial, in addition to publishing the physical exhibits to the jury, the prosecutor asked Jane Doe to read the writings out loud.  The court reporter's transcription of Jane Doe's reading of the exhibits differs in some instances from the content of the actual exhibits.  Among other things, as we will discuss during our analysis of count 2, when Jane Doe read Exhibit 1 out loud for the jury, the court reporter transcribed "He put his *hands* inside my crotch," instead of "He put his *penis* inside my crotch."  (Italics added.)  As to that sentence, either the court reporter made a mistake when transcribing Jane Doe's testimony, or Jane Doe made a mistake when reading Exhibit 1 to the jury.

[5]    Jane Doe was not sure whether she wrote Exhibit 2 on a page of her journal, which she then tore out, or whether she wrote it on a loose piece of paper.

scrolling through Instagram or TikTok, and which made her feel that the singer "knew what I was feeling." The second writing, admitted into evidence as Exhibit 2, stated:

> "I ba[w]led because I couldn't take the pain. I felt used, worthless and just empty. I begged please stop I can't take it I mean it. But he kept on going and panic's overflowing to where I couldn't do it anymore. I didn't even know him. Why does he feel like I owe him something like he owned me. He's on top of me it starts to hurt so fucking bad so I ask hold up wait can you get off please. He said I can't leave until he is cumming. So he says I have to take the D. At this point I'm really crying and I can't take it but he's not listening. But fuck it most people don't get it. You could never fucking understand how it feels to be a woman stuck under a fucking man. Crying and fighting when I can't even move his goddamn hands. I lay there and I'm crying until he's done with his demands. Just in case some of you motherfuckers are uneducated let me break it down. Just listen I'll explain it. Any woman can change their mind at any moment. Any woman should be asked for consent first. I know it's hard to understand for a selfish man like him. I just don't u[n]derstand, Why me? [ ] He can't do this to anyone but was I asking for it? Was I wearing to[o] revealing of clothes? Was it my fault? Why why why?"

Jane Doe disclosed the rape to adults in December 2021, several months after it occurred. Her parents notified the police. Renfroe was charged with raping a child under the age of 14 and seven or more years younger than him (§ 269, subd. (a)(1)) (count 1); sexual penetration by force upon a child under the age of 14 and seven or more years younger than him (§ 269, subd. (a)(5)) (count 2); and committing a lewd act by force on a child under the age of 14 (§ 288, subd. (b)(1)) (count 3).

At trial, the jury was presented with a stipulation stating that Renfroe had recently been convicted of committing four sex-related crimes against two

5

other girls around the same time as the incident involving Jane Doe. The stipulation stated that Renfroe had been convicted of the following crimes: "One, using a minor to produce child pornography, a felony, committed May 19th, 2021, on Jane Doe, initials DG, age 13 years old. [¶] Two, unlawful sexual intercourse with a minor more than three years younger than defendant, a felony, committed June 6th, 2021, on Jane Doe, initials VD, age 16 years old. [¶] Three, oral copulation with a minor, a felony, committed January 1, 2021 through June 6, 2021, on Jane Doe, initials VD, age 16 years old. [¶] Four, sexual penetration with foreign object, a felony, committed January 1st, 2021, through June 6th, 2021, on Jane Doe, initials VD, age 16 years old."

After indicating that they were unable to reach a verdict on counts 1 and 2, the jury conducted further deliberations and convicted Renfroe on all three counts. The trial court sentenced Renfroe to prison for an indeterminate term of 30 years to life.

## DISCUSSION

A. *Renfroe's Challenge to the Trial Court's Admission Into Evidence of Exhibit 1 and Exhibit 2*

1. *Relevant Proceedings*

During Jane Doe's trial testimony, the trial court considered and ruled upon defense counsel's objection, on the basis of hearsay, to the admission of both of Jane Doe's writings that we have quoted in full above (i.e., Exhibit 1 and Exhibit 2).

As to Exhibit 1, Jane Doe explained that she composed it in her bedroom "a couple of hours" after the rape occurred, after returning to her house and showering. Jane Doe stated that she was "more or less" calm when she left the gathering, and the shower "kind of" calmed her down as well. Jane Doe explained that she composed Exhibit 1 in a notebook and that

6

she "just love[s] writing." When asked whether she kept a diary, Jane Doe replied, "Kind of. I just write what I did that day, how I was feeling. I like to try to keep track of my feelings and emotions day to day." According to Jane Doe, when she wrote about the incident with Renfroe, "I felt like it was all happening again. I could feel his hands on me even though they weren't there. And . . . it felt fresh. Like, it felt like it was very emotional."

Based on Jane Doe's testimony about the circumstances under which she composed Exhibit 1, the trial court overruled defense counsel's hearsay objection to its admission. In explaining that ruling, the trial court identified Evidence Code section 1240, which is an exception to the hearsay rule for spontaneous statements.[6] The prosecutor then asked Jane Doe to read Exhibit 1 out loud to the jury, and Exhibit 1 was also published "for the jury to follow along while the witness reads."

The People then elicited testimony from Jane Doe about the circumstances under which she composed Exhibit 2. Specifically, after confirming with Jane Doe that she had written about the incident a second time, the prosecutor asked how much time passed between the incident and her composition of Exhibit 2. Jane Doe replied with the following: "I want to say a couple weeks. I started getting nightmares, just like reliving the moment. And then there was a song that was written about like a situation

---

[6]     During trial, after the prosecutor began questioning Jane Doe about Exhibit 1, but before defense counsel formally made a hearsay objection on the record and conducted voir dire of Jane Doe about the circumstances under which she wrote Exhibit 1, the prosecutor asked for a sidebar conference. The conference was unreported, but we infer that the subject matter concerned the prosecutor's intention to request that Exhibit 1 be admitted into evidence. The record does not reflect whether the trial court reviewed the contents of Exhibit 1 during the unreported conference or what arguments counsel may have made for and against the admission of the exhibit.

7

like this, which you'll see in there. So I started writing about that." The prosecutor showed Exhibit 2 to Jane Doe and then asked, "And now that you've had a chance to look at it, is it an accurate description of what happened that day?" Jane Doe replied, "Yes. But like I said, I wrote it after multiple nightmares."

When the prosecutor indicated that she intended to publish Exhibit 2 to the jury, defense counsel made a hearsay objection, which the trial court overruled. In so doing, the trial court did not identify any basis for its ruling, stating simply, "Objection overruled." The prosecutor then published Exhibit 2 to the jury and asked Jane Doe to read it out loud.

On cross examination, defense counsel asked Jane Doe about the song she had mentioned in connection with Exhibit 2. Jane Doe stated that "[p]arts" of Exhibit 2 were taken from a song, but that "it's a lot of my writing and [sic] mixing with it." Upon further inquiry by defense counsel, Jane Doe confirmed that all of the specific statements in Exhibit 2 that defense counsel asked about were lyrics from the song. Specifically, those statements were, "You could never fucking understand how it feels to be a woman stuck under a fucking man. Crying and fighting when I can't even move his goddamn hands. I lay there and I'm crying until he's done with his demands," and "He said I can't leave until he is cumming."[7] On redirect, the prosecutor asked, "What was it about the song that caused you to incorporate or borrow some of those words and put it in that exhibit?" Jane Doe replied, "It felt like she

---

[7]     Jane Doe could not remember the name of the song during her trial testimony. In connection with Renfroe's motion for a new trial, filed several months after the conclusion of the jury trial, defense counsel was able to identify the song that Jane Doe quoted from in Exhibit 2. As shown during the motion for a new trial, a majority of the words in Exhibit 2 are lyrics from the song, including some lyrics that defense counsel did not ask Jane Doe about during cross examination.

knew what I was feeling.  I felt like I knew [sic] I was explaining how I felt in that situation."  Jane Doe also explained that she found the song while scrolling "[o]n Instagram or TikTok, maybe.  I really don't remember.  But I was like, 'Oh, that sounds familiar.  That sounds like something I was feeling.' "

Renfroe contends that the trial court erred by admitting into evidence both Exhibit 1 and Exhibit 2.  The People disagree, contending that both exhibits were properly admitted as spontaneous statements under Evidence Code section 1240 and that, in the alternative, any error was harmless.

2.      *Applicable Legal Standards*

Evidence Code section 1240 provides, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

"For an out-of-court statement to fall within the spontaneous statement exception to the hearsay rule, ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Mataele* (2022) 13 Cal.5th 372, 410 (*Mataele*).)  "A statement meeting these requirements is 'considered trustworthy, and admissible at trial despite its hearsay character, because "in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of

9

the speaker's actual impressions and belief." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 64 (*Merriman*).)

"We review the trial court's ruling concerning whether a hearsay statement falls within the spontaneous statement exception for abuse of discretion." (*Mataele, supra*, 13 Cal.5th at p. 411.) " '[U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter.' " (*People v. Brown* (2003) 31 Cal.4th 518, 541 (*Brown*).)

The parties do not dispute that, in broad terms, the first and third requirements for the application of Evidence Code section 1240 are present with respect to Exhibit 1 and Exhibit 2: a startling occurrence, and a statement that relates to the occurrence. (*Mataele, supra*, 13 Cal.5th at p. 410.) The dispute is over the second requirement, namely, whether the statement was made "before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." (*Ibid*.) "[T]he discretion of the trial court is at its broadest when it determines whether this requirement is met.' " (*People v. Lynch* (2010) 50 Cal.4th 693, 752.)

3. *The Admission of Exhibit 1*

" 'A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was "time to contrive and misrepresent," ' such as 'the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection

10

and fabrication.' " (*Mataele, supra*, 13 Cal.5th at p. 411.) "[T]hese factors 'may be important, but solely as an indicator of the mental state of the declarant.' [Citation.] For this reason, no one factor or combination of factors is dispositive." (*Merriman, supra*, 60 Cal.4th at p. 64.) Applying these factors, the fundamental inquiry is whether a statement is "undertaken without deliberation or reflection." (*People v. Morrison* (2004) 34 Cal.4th 698, 718; see also *People v. Raley* (1992) 2 Cal.4th 870, 892 (*Raley*) ["A spontaneous statement is one made without deliberation or reflection."].)

As an initial matter, we focus upon " 'the passage of time' " (*Mataele, supra*, 13 Cal.5th at p. 411) between the rape and Jane Doe's act of writing in her journal. According to Jane Doe, she composed Exhibit 1 approximately a "couple hours" after Renfroe assaulted her. The trial court could reasonably conclude that the lapse of approximately two hours between the rape and Jane Doe's composition of Exhibit 1 was consistent with Jane Doe still being in a highly emotional and nonreflective state of mind. Case law reveals numerous instances in which a person's "reflective powers" were still "in abeyance" (*Mataele, supra*, 13 Cal.5th at p. 410) after the passage of two hours or more following a startling occurrence. For example, in *Brown, supra*, 31 Cal.4th 518, our Supreme Court held that the declarant's statement two and a half hours after witnessing a murder was properly admitted under Evidence Code section 1240 when the facts supported the trial court's conclusion that "the declarant continued to labor mightily under the emotional influence of the disturbing events he perceived," as evidenced by the fact that he was "crying, shaking and visibly upset." (*Id*. at p. 541.) Similarly, in *People v. Clark* (2011) 52 Cal.4th 856, our Supreme Court explained that "[a]lthough [the victim's] statement came two to seven hours after the shocking and disturbing events, it retained its spontaneity because,

11

as the evidence showed, her mental and physical condition prevented her from reflecting on and fabricating her account of what had happened." (*Id*. at p. 926; see also *Raley, supra*, 2 Cal.4th at p. 894 [when the victim was "in shock from [a] head injury, exposure to the elements and excessive bleeding" and was "in mental agony and in severe pain," the trial court was within its discretion to conclude that her statements about a sex crime that occurred 18 hours earlier qualified as a spontaneous statement]; *People v. Blacksher* (2011) 52 Cal.4th 769, 817–818 [statements made "well over an hour after the murders" were admissible under Evid. Code § 1240 when the declarant was "hysterical, upset, and 'screaming and hollering' "].) As demonstrated by this case law, although the lapse of time is relevant, "[t]he crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker," rather than "how long it was made after the startling incident." (*Brown*, at p. 541.)

Similarly, the fact that Jane Doe made the statement in writing, rather than in spoken words, is not dispositive. (See *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 180–181 [written record of a license plate number made immediately after it was observed during an exciting event qualified as a spontaneous statement].) Jane Doe explained that she used her journal to record her "feelings and emotions." She composed Exhibit 1 at her first opportunity when she reached a place of safety and security after being in the presence of Renfroe, who had threatened to kill her and her family if she made a disclosure. As an 11-year-old girl, Jane Doe's act of writing in her journal at her first secure opportunity could reasonably be viewed as the same type of unreflective expression as someone who "blurt[s] out" a statement after a traumatic event, as compared with a deliberate statement

12

made under questioning. (See *Mataele, supra*, 13 Cal.5th at p. 411 [contrasting a statement that was "blurted out" with a statement made "in response to questioning"]; *People v. Trimble* (1992) 5 Cal.App.4th 1225, 1235 (*Trimble*) [a statement made by a child at "the first secure opportunity for disclosure" outside the presence of the violent perpetrator was admissible under Evidence Code § 1240].)

Although the passage of time and the form of Jane Doe's statement are fully consistent with the application of Evidence Code section 1240, the most salient factor in this case is Jane Doe's "emotional state . . . at the time of making the statement." (*Mataele, supra*, 13 Cal.5th at p. 411.) Jane Doe said that she was "more or less" calm when she left the gathering, but she also explained that as she wrote about the incident she "felt like it was all happening again," "it felt fresh," and she was "very emotional." Rape is a shocking crime of violence, one difficult for even an adult to process. But here, an 11-year-old girl was raped by a 34-year-old man she barely knew in a friend's bathroom. It was reasonable for the trial court to infer that it would have taken a long time for an 11-year-old to regain her reflective powers after the rape. (See 2 McCormick on Evidence (9th ed. 2025) The Hearsay Rule, § 272.1 [under the theory that "the general psychological characteristics of children typically extend the period that is free of the dangers of conscious fabrication," many courts "have liberally interpreted the allowable period of time between the exciting event and the child's description of it"].) In those circumstances, Jane Doe's description of her "very emotional" state as she wrote in her journal amply supports a finding that Jane Doe's reflective powers were still in abeyance. As she explained, she literally felt like she was experiencing the assault all over again as she was writing the entry and "could feel his hands on [her] even though they

13

weren't there."  Consistent with her testimony, parts of Exhibit 1 were in the present tense as if written during the assault, such as "This doesn't feel right" and "Why is he doing this to me?"

Jane Doe's "more or less" calm demeanor as she rejoined the gathering after Renfroe's attack did not compel exclusion of Exhibit 1.  The trial court could reasonably have concluded that her demeanor was a result of shock caused by the rape or fear caused by Renfroe's threats, rather than evidence that Jane Doe had regained her ability to reflect and deliberate.  Case law recognizes that when a person has experienced a traumatic and shocking event, a calm demeanor is not necessarily determinative of whether the spontaneous statement exception applies.  (*People v. Poggi* (1988) 45 Cal.3d 306, 319 ["the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity"]; *People v. Jones* (1984) 155 Cal.App.3d 653, 662 ["[c]almness . . . does not necessarily defeat admissibility of a spontaneous statement"]; *People v. Francis* (1982) 129 Cal.App.3d 241, 254 ["[t]hough the declarations were made in a calm manner, this does not necessarily indicate a lack of spontaneity" because calmness was a " 'manifestation of shock' "].)

Our Supreme Court's holding in *People v. Sanchez* (2019) 7 Cal.5th 14 (*Sanchez*) is instructive.  In *Sanchez*, the court found no abuse of discretion in the admission of statements made by five-year old Oscar in an interview with the police about an hour and a half after he woke up and witnessed an intruder who killed his mother and sister.  (*Id*. at pp. 22–23, 38–40.)  In finding no error under Evidence Code section 1240, the Supreme Court reasoned that: "[t]he most important factor was that . . . the underlying event was truly startling, especially for a five year old"; "[t]he court could reasonably conclude it would take a long time for the child to regain his

14

reflective powers after what he saw and experienced"; the interview was "within about an hour and a half of that event"; "Oscar was emotional and crying part of the time"; "[t]he trial court could readily conclude that Oscar had not by then had time to contrive or misrepresent, or to reflect or fabricate"; and, although Oscar had seemed calm when the police first responded to the scene earlier in the morning, "[h]e could well have been in shock, then later reacted emotionally." (*Id*. at pp. 39–40.) Under the circumstances, "[t]he court could reasonably conclude it would take a long time for the child to regain his reflective powers after what he saw and experienced." (*Id*. at p. 40.)

In this case, similar to *Sanchez*, Jane Doe was a child who experienced an extremely traumatic event. The trial court could reasonably conclude that after having repressed any expression of her emotions until she got home to a place of safety, Jane Doe wrote in her journal while still under the immediate influence of the rape and Renfroe's threats, and therefore without the deliberation required to contrive, misrepresent, reflect or fabricate. Moreover, the trial court was in a better position to evaluate Jane Doe's testimony and demeanor to determine her emotional state when she wrote the journal entry. Accordingly, as in *Sanchez*, we conclude that "the court acted within its discretion when it found [the victim] was still under the stress of the earlier events when [she] made the statement." (*Sanchez, supra*, 7 Cal.5th at p. 40.)

The dissent suggests that Jane Doe's description of her own mental state was unreliable because no other witness testimony corroborated it. We disagree for several reasons. First, there is no such corroboration requirement. "Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for

15

proof of any fact." (Evid. Code, § 411.) No other statute requires corroboration of a witness's testimony as to her own state of mind. Evidence Code section 1240 itself imposes no corroboration requirement. (See, e.g., *People v. Sully* (1991) 53 Cal.3d 1195, 1229–1230 [accomplice's spontaneous statement admissible under Evidence Code section 1240 without corroboration]; see also *People v. Anthony O.* (1992) 5 Cal.App.4th 428, 436 ["an excited utterance, alone, may support a conviction"].) More generally, "California law does not require corroboration of the testimony of a child sexual abuse victim . . . ." (*People v. Harlan* (1990) 222 Cal.App.3d 439, 454.) As a matter of Sixth Amendment law as well, the presence of corroborating evidence is not a proper consideration in determining the trustworthiness of a hearsay statement. (*Idaho v. Wright* (1990) 497 U.S. 805, 822, 823; see also *People v. Dennis* (1998) 17 Cal.4th 468, 529 ["The hearsay exception for spontaneous declarations is among those 'firmly rooted' exceptions that carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause."].)

Second, the trial court's implied finding as to Jane Doe's mental state under Evidence Code section 1240 is a determination of preliminary fact subject to appellate review for substantial evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 540–541.) This includes the usual rule that "the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 608.) Even without corroboration, therefore, Jane Doe's testimony regarding her own state of mind is substantial evidence to support the trial court's foundational ruling on this preliminary fact. Although "direct observations of the declarant's emotional state are helpful in determining whether the

16

declarant is speaking under the stress of excitement, such evidence is not in all cases essential. Regardless of the nature or source of the foundational evidence, the trial court's finding on the issue must be upheld if the foundational evidence is substantial." (*People v. Rincon* (2005) 129 Cal.App.4th 738, 753–754 (*Rincon*).)

Third, in making this corroboration argument, the dissent relies on evidence that was not before the trial court at the time of the challenged evidentiary ruling. Specifically, the dissent asserts "there is no evidence that anyone at the gathering noticed anything unusual about Doe after she returned from the bathroom" or observed "the red marks Doe described being left by Renfroe's hands." But the other witnesses had not yet testified when the court admitted Exhibit 1. "In assessing the trial court's evidentiary ruling, we must consider the facts known to the court at the time the ruling was made." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.) " 'To do otherwise would require us to hold the trial court to an impossible standard.' " (*People v. Ramos* (2013) 216 Cal.App.4th 195, 208.) At the time of the challenged ruling, the trial court had no way of knowing whether other witnesses would corroborate Jane Doe's testimony as to her own state of mind or red marks. We may not second-guess the trial court's evidentiary ruling based on facts that were not yet before it at the time.[8]

Finally, even if corroboration were required, the other crimes evidence did in fact corroborate Jane Doe's testimony about the sexual assault and therefore inferentially corroborated her testimony regarding her own state of mind in the immediate aftermath of the assault. By the time of the trial

---

[8]     The dissent also relies on testimony that came after the trial court's evidentiary ruling when it states that Jane Doe "wrote the undated, single journal entry in an otherwise blank notebook as part of her customary practice of keeping a journal."

17

court's ruling on Exhibit 1, it had already decided to admit the other crimes evidence to prove Renfroe's disposition to commit sex offenses against minor victims under Evidence Code section 1108 and had so instructed the jury. Renfroe does not challenge this evidentiary ruling or jury instruction on appeal. Evidence that corroborated Jane Doe's testimony about the sexual assault itself also supported a reasonable inference that she was acting under the immediate influence of this traumatic event when she wrote Exhibit 1. (See *Rincon, supra*, 129 Cal.App.4th at pp. 751–754 [trial court could reasonably infer declarant made statements under stress of excitement caused by gun battle even without specific evidence of his emotional state].)

As a general matter, we agree with the dissent that a written statement is usually more thoughtful and less likely to be admissible under Evidence Code section 1240 than a spontaneous oral statement. But this is not a universal truth. The diary entry of an 11-year-old girl who has just been raped by an adult male and received a death threat against her and her family to prevent her from telling anyone about it is not inherently deliberative as a matter of law. Nor was the trial court required to find that "the content of [this] statement suggested an opportunity for reflection and fabrication." (*Mataele, supra*, 13 Cal.5th at p. 411.) The court could reasonably have concluded that its contents showed an innocent young girl desperately trying to fathom a terrifying and unfamiliar act of sexual violence while she was still under the stress of the event. As one of the out-of-state cases cited by the dissent itself acknowledged, such a written statement could be admissible in "circumstances under which the victim's continuing state of excitement or anxiety and the temporal proximity of the statement to the event would provide sufficient guarantees of

18

trustworthiness to justify admission . . . ." (*State v. Conigliaro* (N.J. Super. Ct. App. Div. 2002) 356 N.J. Super. 54, 69 [811 A.2d 591, 500].)

Ultimately, the result here is dictated by the standard of review. Abuse of discretion is always a deferential standard, but the court's discretion "is at its broadest when it determines whether an utterance was made while the declarant was still under a state of nervous excitement." (*Mataele, supra*, 13 Cal.5th at p. 411, internal quotation marks omitted.) Where there are competing interpretations of the record, "we cannot second-guess the trial court's assessment of the evidence in determining [the declarant's] state of mind." (*People v. Liggins* (2020) 53 Cal.App.5th 55, 64.) Based on the record before it at the time of its ruling, the trial court did not abuse its broad discretion by making an implied finding that Jane Doe wrote Exhibit 1 "under the immediate influence of stress from events that caused sufficient nervous excitement to make her statements about the [rape] spontaneous and unreflecting." (*People v. Dennis* (1998) 17 Cal.4th 468, 528.)

4. *The Admission of Exhibit 2*

Turning to Exhibit 2, as we have discussed, the trial court overruled defense counsel's hearsay objection to that exhibit and admitted it into evidence without identifying a basis for doing so. The People contend that Exhibit 2 was properly admitted as a spontaneous statement. (Evid. Code, § 1240.)

When the trial court ruled on the admissibility of Exhibit 2, it did so based on only the prosecutor's brief examination of Jane Doe regarding that exhibit. Specifically, the prosecutor elicited testimony that Jane Doe had composed Exhibit 2 "a couple weeks" after the incident when she started getting nightmares "reliving the moment." Jane Doe also mentioned a song in connection with Exhibit 2: "And then there was a song that was written

19

about like a situation like this, which you'll see in there. So I started writing about that." Finally, Jane Doe answered affirmatively when the prosecutor asked, "[I]s it an accurate description of what happened that day?"

As we will explain, based on that information, the spontaneous statement exception to the hearsay rule set forth in Evidence Code section 1240 is not applicable to Exhibit 2, and the trial court abused its discretion if it admitted Exhibit 2 on that basis.

Turning to the first relevant factor, we examine " 'the passage of time' " between the startling occurrence and the statement. (*Mataele, supra*, 13 Cal.5th at p. 411). Here, because Jane Doe did not compose Exhibit 2 until "a couple of weeks" after Renfroe sexually assaulted her, a significant amount of time had passed, making it very unlikely that Jane Doe's "reflective powers" were still "in abeyance." (*Id.* at p. 410.) "[O]ur high court has explained that 'allowing admission of a statement that was made approximately eight hours after the startling event may be the exception rather than the rule' [Citation.] And in each of the cases upholding application of the spontaneous statement exception after a delay, the declarant was still laboring under the immediate influence of a startling event." (*People v. Lozano* (2024) 101 Cal.App.5th 366, 378.)

The People cite case law in which a statement made up to *two days* after the startling occurrence was found to fall within the spontaneous statement exception to the hearsay rule. (*Trimble, supra*, 5 Cal.App.4th 1225, 1229, 1235; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1700.) However, the People have not identified any authority, and we are aware of none, suggesting that a person's reflective powers might still be in abeyance after the passage of *multiple weeks*. (Cf. *People v. Gutierrez* (2009) 45 Cal.4th 789, 811 (*Gutierrez*) [citing with approval *In re Cheryl H.* (1984) 153 Cal.App.3d

20

1098, 1130, in which "the Court of Appeal held that the out-of-court statement of a three-year-old girl stating that her father had sexually abused her one to two months earlier was not admissible as a spontaneous statement because the victim was not 'still "under the stress of excitement caused by" the exciting event, in this case the acts of sexual abuse.' "].)

Second, we look to Jane Doe's physical and emotional state while she composed Exhibit 2. (*Mataele, supra*, 13 Cal.5th at p. 411). It is reasonable to infer that Jane Doe was upset about the incident as she wrote. Indeed, she testified that she had been experiencing nightmares. However, the experience of being upset about a traumatic incident following an appreciable passage of time is not the type of "stress of excitement" from a startling event that is required for the application of the spontaneous statement exception in Evidence Code section 1240 unless the declarant's reflective powers are still in abeyance. (*Gutierrez, supra*, 45 Cal.4th at p. 812 [a three-year-old boy, who made statements implicating the defendant two months after his mother's murder, while visiting her grave, did not constitute a spontaneous statement because "[a]lthough there was evidence the boy was upset, . . . there is nothing to indicate that during the two-month period following his mother's murder he had remained under the stress of excitement caused by witnessing the event and that his reflective powers were still in abeyance"].)

Finally, Jane Doe's testimony about why she composed Exhibit 2 precludes a finding that the statements contained therein were made without reflection or deliberation. Jane Doe explained that she composed Exhibit 2 by incorporating song lyrics after realizing that "there was a song that was written about like a situation like this." Jane Doe's exercise of matching up song lyrics with her own experience is a reflective undertaking rather than

21

" ' "the instinctive and uninhibited expression of the speaker's actual impressions and belief." ' " (*Merriman, supra*, 60 Cal.4th at p. 64.)

In sum, due to the passage of time and the evidence showing that Jane Doe was engaged in a deliberate and thoughtful exercise while composing Exhibit 2, if the trial court intended to admit Exhibit 2 as a spontaneous statement pursuant to Evidence Code section 1240, it abused its discretion in doing so.

### 5. *The Error Was Not Prejudicial*

Having concluded that the trial court erred in admitting Exhibit 2 into evidence, we next examine whether the error was prejudicial.

When a trial court abuses its discretion by admitting hearsay evidence, "we analyze the trial court's error under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, to 'evaluate whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." ' " (*Gutierrez, supra*, 45 Cal.4th at p. 813.)

In this case, the main task for the jury was to decide whether it believed Jane Doe's trial testimony that Renfroe sexually assaulted her. Although Renfroe did not testify, during closing argument defense counsel questioned Jane Doe's credibility, contending that Jane Doe's allegations were "just absolutely not true. This event did not happen, at least not with him." Defense counsel argued that there was no corroboration for Jane Doe's allegations, and that it was unreasonable to conclude that Jane Doe could rejoin the gathering immediately after the incident without anyone noticing anything different about her demeanor or any of the red marks that she described from Renfroe's hands.

As the main issue in dispute at trial was Jane Doe's credibility, in examining whether the admission of Exhibit 2 was prejudicial, we focus on

22

whether it is reasonably probable that the jury would have reached a different assessment of whether Jane Doe was telling the truth had the trial court excluded Exhibit 2 from evidence.

In conducting that analysis, we rely heavily on our conclusion that Exhibit 1 was properly admitted into evidence. Through Exhibit 1, the jury was presented with strong evidence to suggest that Jane Doe was telling the truth at trial about Renfroe's sexual assault. Exhibit 1 contains many of the same specific details about the incident that Jane Doe described to the jury: an assault in a bathroom during which Renfroe touched Jane Doe's breasts, put his hand over her mouth, raped her, and then threatened to kill her and her family if she disclosed it. Further, Jane Doe composed Exhibit 1 shortly after the incident, for no audience other than herself, and before she had any motive to lie. All of these factors make Exhibit 1 an extremely important piece of evidence to bolster the credibility of Jane Doe's trial court testimony.

In contrast, because Exhibit 2 was composed approximately two weeks after the rape and primarily consists of song lyrics describing a sexual assault that Jane Doe admitted was similar to, but not identical to, the sexual assault committed by Renfroe, Exhibit 2 would likely have been viewed by the jury as much less probative of Jane Doe's credibility. Although it is relevant that Jane Doe wrote not just once, but twice, about the rape, the jury likely would not have viewed Exhibit 2 as bolstering Jane Doe's credibility in any significant manner, beyond what was already contributed by Exhibit 1.

Accordingly, due to the relatively low value of Exhibit 2 in supporting Jane Doe's credibility when compared to the much more significant content of Exhibit 1, and the fact that Exhibit 2 was essentially duplicative, we conclude that it is not reasonably probable that Renfroe would have obtained a more

23

favorable result at trial if Exhibit 2 had been excluded from evidence when Exhibit 1 was already properly admitted. Renfroe therefore has not established that the trial court committed reversible error by admitting Exhibit 2 into evidence.

B.    *Insufficient Evidence Supports the Conviction in Count 2, and Modification to a Lesser Included Crime Is Not Supported by the Evidence*

We next consider Renfroe's challenge to the sufficiency of the evidence to support the conviction in count 2.

In count 2, Renfroe was found guilty of sexual penetration by force upon a child under the age of 14 and seven or more years younger than him (§ 269, subd. (a)(5)). As the jury was instructed, for that count the People were required to prove, among other things, that (1) "[t]he defendant committed an act of sexual penetration with another person," and (2) "[t]he penetration was accomplished by using a foreign object or unknown object." With respect to the relevant terminology, the jury was instructed: "Sexual penetration means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification. [¶] A foreign object includes any part of the body except a sexual organ. An unknown object includes any foreign object, substance, instrument, or device, or any part of the body, including a penis, if it is not known what object penetrated the opening."[9] Because the female genitalia includes "inter alia the labia majora, labia minora, and the clitoris" as well as the vagina, "penetration of the labia majora" is sufficient to establish sexual penetration. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1364, 1367.)

---

9    There was no suggestion in this case that Jane Doe was penetrated by an "unknown object." Instead, as we will explain, the People's theory for count 2 is that Jane Doe was digitally penetrated.

24

During closing argument, the prosecutor failed to discuss the People's theory of guilt for count 2 or identify for the jury any evidence that showed any sort of penetration for that count. On appeal, the People's theory is that sufficient evidence supports a finding that Renfroe digitally penetrated either Jane Doe's genitals or her anal opening.

To evaluate Renfroe's challenge to the sufficiency of the evidence, "we must ' "review the entire record in the light most favorable to the judgment," ' and then determine whether it contains ' "evidence that is reasonable, credible, and of solid value" ' such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt. . . . [¶] . . . We must ' "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence . . . ' . . . for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' . . . But we cannot, however, venture beyond the evidence presented at trial, and may consider only those inferences that are reasonably supported by the record. ' "[A] reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " ' . . . It 'must logically flow from other facts established in the action,' and it cannot be 'based entirely on the suspicions of the officers involved in the case and the conjecture of the prosecution.' " (*People v. Ware* (2022) 14 Cal.5th 151, 167–168, citations omitted.)

As discussed, Jane Doe testified that Renfroe "had his hand in [her] pants" and then removed her pants. Jane Doe stated that Renfroe was "trying to feel around" and was "looking and rubbing his hands over my butt and the front, where my vagina is." "[I]t hurt" because Renfroe "was applying a lot of pressure" and "his hands were big." The prosecutor asked Jane Doe,

25

"Did anything penetrate your vagina . . . from his hand?" Jane Doe replied, "No." The prosecutor did not inquire any further about digital penetration, either of Jane Doe's genitals, including her labia, or her anal opening.

Although acknowledging Jane Doe's testimony that Renfroe did *not* digitally penetrate her vagina, the People contend that substantial evidence nevertheless supports a finding of digital penetration. For that argument, the People rely on one sentence in Exhibit 1. However, the People's argument is based on the court reporter's *erroneous* transcription of Exhibit 1. According to the reporter's transcript, when Jane Doe read Exhibit 1 out loud to the jury, she stated, "He put his *hands* inside my crotch. It hurt so, so bad." (Italics added.) The People argue that by stating Renfroe put his hands "inside" her crotch, it is reasonable to infer that Jane Doe was referring to digital penetration.

However, based on our review of Exhibit 1, that is not what Jane Doe wrote. Exhibit 1 states, in legible handwriting, "He put his *penis* inside my crotch. It hurt so so bad." (Italics added.) Further, there are no other statements in Exhibit 1 or Exhibit 2 that could be construed as describing digital penetration.[10] Therefore, Jane Doe's only description of Renfroe using his hands in her genital and anal area is her testimony that Renfroe was "trying to feel around," "rubbing his hands over" that area, and "applying a lot of pressure" with "big" hands. That testimony cannot reasonably be understood as describing penetration.

---

[10]    In reviewing the sufficiency of the evidence to determine whether retrial is permissible for purposes of double jeopardy, we "must consider *all* of the evidence presented at trial, including evidence that should not have been admitted." (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) Accordingly, we may consider Exhibit 2 in evaluating the sufficiency of the evidence for count 2.

Accordingly, because the record contains no evidence that could support a reasonable inference that Renfroe penetrated Jane Doe's vagina or anal opening with anything other than his penis, insufficient evidence supports a verdict of guilt in count 2 for sexual penetration by force upon a child under the age of 14 and seven or more years younger than him (§ 269, subd. (a)(5)). Double jeopardy bars retrial on that count. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39.)

The People argue that if we conclude insufficient evidence supports the conviction in count 2, we should exercise our discretion to reduce the conviction in count 2 to the lesser included offense crime of *attempted* sexual penetration by force upon a child under the age of 14 and seven or more years younger than him. "[W]hen a trial or appellate court concludes that there is insufficient evidence to support a conviction of a greater offense, it can reduce the conviction to a lesser included offense that is supported by the evidence." (*People v. Goolsby* (2016) 244 Cal.App.4th 1220, 1225; see also *People v. Navarro* (2007) 40 Cal.4th 668, 677; §§ 1181, subd. (6), 1260.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Renfroe does not dispute that attempted sexual penetration in violation of section 269, subdivision (b)(5) is a lesser included offense of the completed offense. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 157 [concluding that because the definition of sexual penetration requires that the act be done "for the purpose of sexual arousal, gratification, or abuse," attempted sexual penetration of a child 10 years old or younger is a lesser included offense of the completed offense, as both include a specific intent element].) However, he argues that insufficient evidence supports a

27

finding that he attempted to sexually penetrate Jane Doe's genitals or anal opening with his hands.

Jane Doe's testimony about Renfroe's use of his hands in her genital and anal area was extremely brief due to the People's limited questioning on that subject. As noted, Jane Doe stated that Renfroe "had his hand in [her] pants," was "trying to feel around" and "rubbing his hands over" her "butt" and vaginal area, and that it hurt because Renfroe "was applying a lot of pressure" and "his hands were big."

Jane Doe's limited testimony about Renfroe's use of his hands is not sufficient to support a finding that Renfroe was trying to penetrate either Jane Doe's genitals or her anal opening. In fact, Jane Doe's use of the phrases "trying to feel *around*" and "rubbing his hands *over*" seems to describe a type of surface-focused action that is different from attempted penetration. Although Jane Doe mentioned feeling "pressure," she did not specify that the pressure was from an attempt at digital penetration, as opposed to forceful external rubbing. Moreover, Renfroe eventually succeeded in forcing his penis inside Jane Doe's genitals, which suggests that he would have been able to force digital penetration if he had chosen to do so. Finally, Jane Doe did not write anything in Exhibit 1 or Exhibit 2 to suggest that Renfroe attempted digital penetration. Accordingly, we conclude that a conviction in count 2 for the lesser included offense of attempted sexual penetration by force is not supported by substantial evidence, and we therefore reject the People's request that we modify the conviction in count 2 to reflect that crime.

## DISPOSITION

Renfroe's conviction in count 2 for sexual penetration by force upon a child under the age of 14 and seven or more years younger than him (§ 269,

subd. (a)(5)) is reversed, and this matter is remanded for resentencing on counts 1 and 3.


BUCHANAN, J.

I CONCUR:


McCONNELL, P. J.

CASTILLO, J., Concurring in part and dissenting in part.

I join the majority opinion as to all but section A.3 of the discussion—The Admission of Exhibit 1—concerning an undated, single journal entry written in isolation hours after the incident to describe the attack. Based on the content and circumstances of the journal entry, the evidence is insufficient to establish the entry was written while Jane Doe's reflective powers were still in abeyance. I would thus conclude the trial court abused its discretion in finding Exhibit 1 admissible as a spontaneous statement under Evidence Code section 1240. I would further conclude its admission was prejudicial.

## I.

A spontaneous statement is admissible as an exception to the hearsay rule if it purports to describe or explain an act or condition perceived by the declarant and was made while the declarant was under the stress of the excitement caused by the perception. (Evid. Code, § 1240.) "[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903.)

To render a spontaneous statement admissible under section 1240, "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate *and* the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it."

(*Showalter v. Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468, italics added.)

Like the parties, I focus on the second requirement—whether Doe wrote the entry while the nervous excitement dominated and her reflective powers were still in abeyance. I recognize "the discretion of the trial court is at its broadest when it determines whether this [second] requirement is met." (*People v. Poggi* (1988) 45 Cal.3d 306, 318–319.) But, as the majority recognizes in finding the trial court abused its discretion in admitting Exhibit 2 (maj. opn. at pp. 23–24), a trial court's broad discretion is not unfettered. (See *People v. Lynch* (2010) 50 Cal.4th 693, 754.)

### A.

In my view, the evidence does not support the conclusion that Doe's Exhibit 1 journal entry qualifies as a spontaneous statement under section 1240.

"A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent.'" (*People v. Merriman* (2014) 60 Cal.4th 1, 64.) These factors include (1) "the passage of time between the startling event and the statement," (2) "whether the declarant blurted out the statement or made it in response to questioning," (3) "the declarant's emotional state and physical condition at the time of making the statement," and (4) "whether the content of the statement suggested an opportunity for reflection and fabrication." (*Ibid*.) The fundamental inquiry, however, is whether the statement was "undertaken without deliberation or reflection." (*People v. Morrison* (2004) 34 Cal.4th 698, 718.) When the facts show the declarant's "mental state while describing the attack was thoughtful and reflective," a

2

trial court abuses its discretion by concluding that section 1240 applies. (*Lynch*, 50 Cal.4th at p. 754.)

Beginning with the first factor, the passage of time between the incident and Doe writing Exhibit 1 is not determinative one way or another. According to Doe, she composed Exhibit 1 a "[c]ouple hours" after James David Renfroe assaulted her. Though not dispositive, the time between a startling event and a later declaration "will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 810.) Depending on the specific facts, a person's "reflective powers" might still be "in abeyance" hours after a startling occurrence. (*Showalter*, 16 Cal.2d at p. 468.) Thus, I do not rule out the application of section 1240 merely because Exhibit 1 was composed about two hours after the incident.

The second factor—the context in which Doe made the statement—does not support admitting Exhibit 1 as a spontaneous statement. According to Doe, she wrote the undated, single journal entry in an otherwise blank notebook as part of her customary practice of keeping a journal. Doe testified she "just love[s] writing" and "just write[s] what [she] did that day, how [she] was feeling, [and she] like[s] to try to keep track of [her] feelings and emotions day to day." No bright line rule prohibits treating a writing as a spontaneous statement under section 1240. (See *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 173, 180–181 [piece of paper with license plate number on it given to victim "[s]oon after" robbery admitted as spontaneous statement].) Even so, I agree with non-California courts that have concluded "a writing is more suspect as a spontaneous exclamation than is an oral statement." (*Commonwealth v. DiMonte* (Mass. 1998) 427 Mass. 233, 239.) This is so because "[t]he very fact that it is in writing suggests time and

3

opportunity for reflective thought in its composition." (*State v. Hansen* (Idaho Ct.App. 1999) 133 Idaho 323, 327.) "While it is not impossible, though quite improbable, that a written statement could qualify, the reflection inherent in committing words to a written form would seem to cast considerable doubt on an assertion that the statement is spontaneous." (*Nemeth v. Ford Motor Co.* (Mich.Ct.App. 1975) 61 Mich.App. 359, 364.) Stated differently, "the very nature of the reflective process involved in preparing a narrative written statement suggests that its admission would be the exception, rather than the rule." (*State v. Conigliaro* (Ct.App.Div. 2002) 356 N.J. Super. 54, 69.) As a result, that the statement was a written journal entry, though not automatically disqualifying, does not support it constituting a spontaneous statement.

Nor does the third factor—Doe's emotional state and physical condition when making the statement—support admitting Exhibit 1 as a spontaneous statement. Doe testified she was calm when she left the gathering and that her subsequent shower calmed her down as well. Nevertheless, according to Doe, she was somewhat emotional when she composed Exhibit 1 because, as she wrote about the incident, she "felt like it was all happening again," "it felt fresh" and "felt like it was very emotional."

Yet California cases discussing the admission of spontaneous statements share one commonality lacking here: another witness observed and testified to the emotional state and physical condition of the declarant. In my view, this evidence is important to assess whether the statement was "sufficiently reliable to be admissible under th[e spontaneous statement] exception to the hearsay rule." (*Farmer*, 47 Cal.3d at p. 903.) For example, in *People v. Sanchez* (2019) 7 Cal.5th 14, 40, a police officer spoke with the five-year-old declarant "within about an hour and a half of that event" and

4

testified that, during the interview, the declarant "was emotional and was crying part of the time." "Given the circumstances," our high court concluded the officer's "testimony was credible" because the declarant "had not by then had time to contrive or misrepresent, or to reflect or fabricate." (*Ibid.*) And even in *Gutierrez*, 78 Cal.App.4th at p. 180, where the spontaneous statement was a license plate number written on a piece of paper, a witness testified the declarant of the statement "appeared to be 'quite a little . . . nervous,' i.e., 'scared'" when handing over the piece of paper.

In contrast to *Sanchez* and *Gutierrez*, here, the record contains no other witness testimony establishing Doe's mental state or physical condition when she wrote Exhibit 1. Doe testified that, after Renfroe assaulted her in the bathroom, she "tried" to calm herself down and "tr[ied]" to act normal when she rejoined the group in the backyard because she was "scared" for her family. She sat down next to her friend, at which point they talked about school and "were on [their] phones a little bit." As for Doe's physical condition, she testified she had "hand marks" that were "red wherever he was squeezing me." Yet there is no evidence that anyone at the gathering noticed anything unusual about Doe after she returned from the bathroom. Doe's attempt to act normal may support no one noticing anything different about her demeanor, but does not account for the other individuals, including her friend, failing to observe the red marks Doe described being left by Renfroe's hands.

Critically, even discounting the interactions in the backyard, Doe did not describe any physical distress that would have impeded her ability to reflect and deliberate after getting home and showering. Although Doe described herself as being emotional when she composed Exhibit 1, the evidence does not support the conclusion that Doe's "physical condition was

5

such as would inhibit deliberation." (*People v. Raley* (1992) 2 Cal.4th 870, 894 [sexual assault victim so physically injured it left "no doubt" she "was in mental agony and in severe pain" and thus was "in no condition to fabricate"].) Nor was any third party present to confirm Doe's demeanor and physical symptoms during this critical time. (See *DiMonte*, 427 Mass. at p. 237 [recipient of facsimile written message could not testify to sender's demeanor, tone of voice, or degree of observed excitement or stress when writing and sending message].) Though "such evidence is not in all cases essential," *People v. Rincon* (2005) 129 Cal.App.4th 738, 753–754, it is in this one involving a journal entry. Notably, the two cases the majority cites about section 1240's lack of corroboration requirement did not involve written statements like this journal entry; instead, another witness observed the declarant's demeanor as the oral statement was made. (See maj. opn. at p. 16; *People v. Sully* (1991) 53 Cal.3d 1195, 1214, 1229 [witness observed declarant's "genuine emotional distress and actual physical illness" when making oral spontaneous statement]; *People v. Anthony O.* (1992) 5 Cal.App.4th 428, 433, [testifying officer observed declarant with blood "'spewing from his face'" at time of oral spontaneous statement].) "Because a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement before [a court] could conclude that the writing qualified as a spontaneous exclamation." (*DiMonte*, at p. 239.) The majority contends the other crimes evidence corroborated Doe's testimony about the sexual assault and, in turn, also "inferentially corroborated her testimony regarding her own state of mind in the immediate aftermath of the assault." (Maj. opn. at p. 17.) While the jury could use the other crimes evidence to conclude Renfroe likely

committed the charge offenses (CALCRIM No. 1191A), I disagree the other crimes evidence could be extended so far as to reach Doe's state of mind when she wrote the journal entry hours after the attack.

The fourth and final factor—whether the content of the statement suggested an opportunity for reflection and fabrication—also suggests the journal entry was not a spontaneous statement. Shortly after the incident but hours before writing her journal entry, Doe was "trying to process what had just happened" in the bathroom with Renfroe. And as the content of Exhibit 1 shows, Doe was engaged in a thoughtful and reflective exercise while composing it. She wrote in the notebook, "James Bathroom . . . WHY! [I]s this okay? Can he actually do this? This doesn[']t feel right. . . . [D]id I do something? . . . Why is he doing this to me? [D]id I say something bad? [I]s he even allowed to do this. . . . Why is he doing this. . . . I thought [h]e was a nice person. Why would he do this." "The narrative style as well as the quantity, detail[,] and content of [Doe]'s statements suggest that they were not spontaneous statements made under the stress of excitement without deliberation or reflection, but rather, that they were made after [Doe] had engaged in a deliberative or reflective process." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1525.) The reflective nature of Doe's journal entry shows she used the act of writing in the notebook as an analytical exercise to understand the significance and meaning of Renfroe's actions. (See *State v. Smith* (1992) 241 Neb. 311, 317 ["the very purpose of a diary being to record the conscious reflections of the writer, it is clearly inadmissible as an excited utterance"]; *Michaux v. Temas* (W.D.Pa. July 7, 2020) 2020 U.S. Dist. Lexis 119724, at *26 ["a diary does not qualify as an excited utterance, because it reflects the rendition of events that the author later chose to put down on paper"].)

7

In sum, the evidence does not support the conclusion that Doe wrote the journal entry while her "reflective powers" were still "in abeyance." (*Showalter*, 16 Cal.2d at p. 468.) Because the facts instead show Doe's "mental state while describing the attack was thoughtful and reflective," I would conclude the trial court abused its discretion in finding Exhibit 1 admissible as a spontaneous statement under section 1240. (*Lynch*, 50 Cal.4th at p. 754.)

B.

I would also conclude that admitting Exhibit 1 was prejudicial.[1]

If a trial court abuses its discretion in admitting hearsay evidence, we evaluate whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Gutierrez*, 45 Cal.4th at p. 813 [analyzing erroneous admission of hearsay statement under *Watson*].) Reasonably probable "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) We may consider, "among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) A "hung jury, as opposed to an acquittal, is a 'more favorable' . . . outcome for purposes of harmless error review under *Watson*." (*People v. Hendrix* (2022) 13 Cal.5th 933, 947, fn. 6.)

---

[1] As a result, to the extent the majority relies on Exhibit 1 to conclude the admission of Exhibit 2 was not prejudicial error (maj. opn. at pp. 23–24), I do not join this part of the majority opinion.

8

The People contend any error in admitting Exhibit 1 was not prejudicial. According to the People, "nothing suggests Jane Doe . . . had any motive to lie." Further, the jury was told Renfroe was convicted of other sex crimes against two other minors and, as a result, they could conclude Renfroe was disposed to commit sexual offenses and also conclude he was likely to commit the offenses against Doe. (CALCRIM No. 1191A.)

Other than Renfroe's prior convictions, the only evidence supporting a guilty verdict on any count were Doe's statements (1) during her trial testimony and (2) when she disclosed the incident to adults many months after it occurred. During closing argument, however, defense counsel emphasized the case was about an "uncorroborated allegation" that occurred "many, many months before." As to the allegation, counsel argued it was "absolutely not true" because the "event did not happen, at least not with [Renfroe]." Counsel questioned Doe's credibility, arguing, "For you to believe [Doe] . . . you must believe that not one adult . . . noticed her gone; not one adult noticed her crying and upset; not one adult noticed all of these red marks." Because the jury's role was to assess Doe's credibility about what occurred, any evidence likely to impact the jury's assessment of Doe's credibility was significant.

On this record, the jury likely viewed Exhibit 1 (and Exhibit 2, which we all agree was erroneously admitted) as strong evidence that materially bolstered Doe's credibility. Exhibit 1, in particular, lends credence to Doe's trial testimony because its "narrative style as well as the quantity, detail and content" tracks and thus corroborates the incident Doe described to the jury. (*Ramirez*, 143 Cal.App.4th at p. 1525.)

Underscoring the value of Exhibit 1 (and Exhibit 2) to the People's case, the prosecutor specifically urged the jury to use the journal entries to

9

corroborate Doe's trial testimony. During closing argument, the prosecutor stated, "We have proof that this happened as validated by the fact that [Doe] took the time to write about it, not once, but twice."

The circumstances surrounding jury deliberations are helpful in evaluating whether an error was prejudicial. Before reaching a verdict, the jury reported it was deadlocked on counts 1 and 2 and requested a readback of Doe's trial testimony. Thus, despite the jury being told Renfroe was convicted of other sex crimes against two other minors, the circumstances surrounding these deliberations show "the jury did not find this to be an open-and-shut case." (*Hendrix*, 13 Cal.5th at p. 947 [error prejudicial where "jury reported a deadlock midway through deliberations and requested a transcript or readback of [defendant's] jailhouse phone calls"].)

Because the question of Renfroe's guilt turned on whether the jury believed Doe's testimony, the erroneous admission of evidence that materially bolstered Doe's credibility makes it reasonably probable the jury would have, at a minimum, been unable to reach a verdict absent the evidentiary error. (See *People v. Ogunmola* (1985) 39 Cal.3d 120, 124 [erroneous admission of evidence prejudicial when "the case pitted the credibility of the complaining witnesses against that of defendant and his nurses" and jury would have placed "much weight" on evidence that "impermissibly corroborated" testimony of complaining witnesses].) Based on these considerations, I would conclude the erroneous admission of Exhibit 1 was prejudicial.

## II.

In the end, the ultimate issue is whether Doe's journal entry has sufficient indicia of reliability or sufficient guarantees of trustworthiness to justify its admission under the spontaneous statement exception to the

hearsay rule.  For the reasons discussed above, I find Exhibit 1 does not. Accordingly, I respectfully concur in part and dissent in part.


CASTILLO, J.

11